LEA *v.* STATE.*

(Division B. April 6, 1925.)

[103 So. 368.   No. 24706.]

1. HOMICIDE. *If declarant had any hope of recovery, however faint, dying declaration is not admissible.*

A dying declaration is made without the sanctity of an oath and without an opportunity to cross-examine the declarant. To take

the place of that sanctity and that right, there must be an undoubting belief in the mind of the declarant at the time the declaration is made that death is upon him. If it appear that he has any hope of recovery, however faint, the required sanctity is not afforded, and the alleged dying declaration cannot be received.

2. HOMICIDE. *On failure to show that declarant was without hope of recovery, dying declaration held inadmissible.*

Deceased lingered about thirty days, and died from a wound made by the defendant, indicted for his murder. During that period the deceased several times stated that he had no hope of his recovery; but immediately before making an alleged dying declaration he was asked how he felt, and replied that he felt very well. He was then told by one of his nurses that there was no hope of his recovery, that he would probably die during the day, to which he replied, "I reckon so." The nurse stated to him in that connection that a declaration from him as to the facts of the homicide might be of help to his loved ones, in reply to which he said he would make a statement later. He then made a statement as to the facts of the homicide, which was taken down by one of his nurses without his consent or knowledge. *Held*, that the alleged dying declaration did not meet the requirements of the law; that the evidence failed to show that the declarant was without any hope of recovery whatever.

---

*Headnotes 1. Homicide, 30 C. J., Section 498; On admissibility in evidence of dying declarations made under sense of impending death, see note in 56 L. R. A. 382, 1 R. C. L., pp. 538, 539; 1 R. C. L. Supp., p. 190; 4 R. C. L. Supp., 40; 2. Homicide, 30 C. J., Section 504.

APPEAL from circuit court of Lincoln county.
HON. E. J. SIMMONS, Judge.

Charlie Lea was convicted of manslaughter, and he appeals. Reversed and remanded.

*Naul & Yawn* and *J. H. Sumrall*, for appellant.

Except for the alleged dying declaration, improperly admitted in evidence in this case, the state wholly failed to present anything to the jury which would, by the wildest stretch of the imagination, indicate that a crime had been committed by the appellant, and, therefore, our

attention will first be directed to a discussion of said alleged dying declaration, in an attempt to show that under the well-recognized rules and principles laid down by the courts from time immemorial, this alleged dying declaration was improperly admitted in evidence; and, therefore it is safe to assume that the erroneous verdict of conviction was brought about by this one principal error of the court. 1 R. C. L. 537; *McDaniel* v. *State,* 8 S. & M. 401.

. The ordinary rules that are invoked for the determination of the admissibility of evidence generally, or the competency of the witness testifying, are applicable to the admissibility of dying declarations, and to the competency of the declarant at the time he made the declaration. Hence whatever would exclude the testimony of the witness if living, will exclude his dying declaration, and whatever would render a witness, if living, incompetent to testify, will make the declaration inadmissible by reason of such incompetency, and, therefore, dying declarations ought to be admitted with scrupulous care. They have not, necessarily, the sanction of an oath; they are made in the absence of the prisoner; the person making them is not subject to cross-examination, and is in no terror of prosecution for perjury. 1 R. C. L. 537.

The facts testified to in this case by the several witnesses introduced by the state in their attempt to qualify this alleged dying declaration, when accepted with the most force possible to apply to them, do nothing more than indicate that the deceased constantly and habitually and at all times during his confinement in the hospital, extending over a period of more than thirty days, indicated a lack of hope for ultimate recovery; and we respectfully submit that it is a well-established rule that such general statements made by a person suffering from wounds are not sufficient to show the extreme consciousness of impending dissolution necessary to make any declaration of such person admissible. 1 R. C. L. 539.

Another general rule universally subscribed to, which is directly applicable to the facts in this case as dis-

closed by the record, and which qualifies and limits the only evidence introduced in an effort to qualify this pretended dying declaration for admissibility is as follows: "It is to be borne in mind, however, that it is quite common for a person who is injured, or very ill, to say that he will not recover, or that he will die, when there is no good or sufficient reason for the apprehension, and when he is not conscious that he is in any real danger. Such expressions are often the result of impatience, restlessness or great suffering. It is necessary for the declarant to believe that he is about to die as evidence of a sense of impending death." 1 R. C. L. 545.

Applying the last announced rule to the facts disclosed by this record, it is manifest that the evidence introduced by the state, through the nurses who attended the deceased during his confinement in the hospital, only indicated that the deceased, from the time of his arrival at the hospital, constantly indulged in language indicating only lack of hope of final recovery; and certainly under the rule last announced this testimony is not sufficient to give such sanctity to this pretended dying declaration as is required by the law to make same admissible.

After considering this testimony we believe that the court will agree that it is manifest that the witness, Miss Beasley, being the person to whom the alleged statement was made, is necessarily the proper person to testify as to what the state of mind of the declarant was at the time the alleged statement was made; she being the only person who knows what induced the statement made to her, and she fails to state that the declarant knew of his impending death, and depends only on her supposition, or opinion as to whether or not he heard the final statement claimed by any witness to be made as to the fact that declarant was in fact dying at that time.

30 C. J., page 266, states the following rule: "That the declarant's belief that death was impending could not be shown by the bare conclusion of the witness that the declarant knew he was going to die in a short time,

and that the opinion of the witness that the deceased was under a religious sense of responsibility to his maker is inadmissible." See *Wilkerson* v. *State,* 134 Miss. 853; *Haney* v. *State,* 129 Miss. 486.; *Jim Hathorn* v. *State,* 102 So. 772.

*J. L. Byrd,* Assistant Attorney-General, for the state.

THE ADMISSIBILITY OF THE DYING DECLARATION.    The circuit judge followed the rule laid down by this court in *Wilkinson* v. *The State,* 134 Miss. 853, and in the absence of the jury determined from the evidence that the statement sought to be introduced was a declaration made *in extremis* and was in fact a dying declaration.   The evidence showed first that the deceased never had any hope of ultimate recovery, but on the other hand shows that he believed that he was going to die.   There can be no question as to this when we review the testimony on this point.

Another objection is made as to the manner of taking the dying declaration by the nurse and her reduction of it to writing, and the argument is that it was gotten by stealth and taken down in writing without the knowledge of the deceased, and that, therefore, it was rendered incompetent and inadmissible.   We submit that it was not incompetent or inadmissible.   The record shows that on the day the declaration was made and reduced to writing, that the nurses had told the deceased that he was a very sick man and would probably not live through the, day.   In other words, that he was going to die shortly, to which he responded, "Yes,—I reckon so."   And that in a few minutes he began to tell one of the nurses about how the tragedy occurred, and the head nurse coming up at the time heard the statement and got a piece of paper and reduced it to writing.   It is true that the record does not show that the dying man knew that she was reducing his statement to writing, but we know of no rule of law which requires him to know this, nor do we think it material whether his statement was ever read to him.   There is no rule of law that we can find after diligent search

which makes either of these things necessary before the statement is admissible.

The question, and the only question, is, was the deceased laboring under the belief of impending dissolution? If so, the declaration was properly admitted.

Of course, we have no criticism of the numerous textbooks and cases cited by learned counsel for appellant for they correctly announce the general law as to the admissibility of dying declarations, etc., but we submit that the state fully met all of the burden placed on it by the laws quoted, and that, therefore, an analysis of these authorities would serve no good purpose and would lengthen this brief for no purpose. We submit, therefore, that his dying declaration was properly admitted.

*M. S. McNeil,* also for the state.

This court, in the case of *Guess* v. *The State,* 96 Miss. 871, laid down certain recognized rules governing the introduction of dying declarations. That the dying utterances here were made by a sane mind and were restricted to the homicide and the circumstances immediately attending it cannot be questioned in this case. The sole remaining question for the consideration of this court in determining the admissibility of this evidence is: "Were the statements made under the realization and solemn sense of impending death?"

During the entire time that this witness attended the deceased there was never a single instance that he ever held out any hope of recovery. Miss Berry had the opportunity of observing the deceased for one month and three days before his death; she conversed with him daily, and gave it as her positive opinion, based upon these observations, that the deceased was laboring under the conscious belief of impending dissolution. Not only is this true, but on one occasion the deceased called for a Bible, and one not being available, she carried him a prayer book, and he requested her to read to him a prayer, which she did.

Tested by every principle laid down by the authorities, I am unable to see how appellant can seriously contend that the dying declaration offered in this case failed to meet a single requirement of the law. Each of the foregoing witnesses offered upon this subject had occasion to observe the deceased for one month and three days. They saw him every day; they talked to him and observed his conduct every day, and they were thoroughly capable and qualified of forming an opinion as to his state of mind and on the question as to whether or not the deceased believed at the time he made the declarations in question that he was going to die. And these witnesses, in answer to questions propounded by the court, of one accord stated that it was their candid opinion, based upon the facts before them, that the deceased believed he was going to die and that death was impending at the moment he made the declarations in question. These opinions are the opinions of disinterested witnesses, intelligent witnesses, and witnesses who could not possibly have had any interest in this controversy whatever, and these opinions cannot be disregarded by the court in weighing the testimony upon this issue. In *Hathorn* v. *State,* 102 So. 772, this court quotes with approval the case of *Bell* v. *State,* 72 Miss. 507.

The learned circuit judge, after considering the foregoing testimony in all of its phases, having an opportunity to observe the appearance and conduct of the witnesses on the witness stand, with all of the decisions of this court in mind, unhesitatingly decided, after developing all of the necessary preliminary proof in the absence of the jury, that this testimony came within the rules so frequently announced by this court, and his opinion, although not binding upon this court, should at least be given some weight in determining the question at issue.

Argued orally by *J. A. Naul* and *J. H. Sumrall,* for appellant, and *J. L. Byrd,* Assistant Attorney-General, for the state.

ANDERSON, J., delivered the opinion of the court.

Appellant, Charlie Lea, was indicted in the circuit court of Lincoln county, on a charge of the murder of Hadden Smith, was tried and convicted of manslaughter, and sentenced to the penitentiary for ten years, from which judgment he prosecutes this appeal.

Appellant and deceased were brothers-in-law. The homicide took place in the barn of appellant's father. Appellant's wife, his father and mother, and other witnesses were present. There was ill feeling between appellant and the deceased. The evidence for the state tended to show that appellant was the aggressor in the difficulty and was guilty of murder. The evidence for the defense tended to show that the deceased was the aggressor, and that appellant cut and killed the deceased in self-defense. Several assignments of error are argued on behalf of appellant.

The court admitted over appellant's objection an alleged dying declaration made by the deceased on the day of his death, which took place in the Charity Hospital at Jackson. This dying declaration was made in the presence of two nurses in the hospital, Miss Beasley and Miss Vaughan, and was taken down in writing by the latter, and by her verified and read to the jury on the trial. The deceased was in the hospital about thirty days before his death. He was attended by three nurses, the two referred to and Miss Berry. The dying declaration admitted by the trial court over appellant's objection, is in this language:

"Mr. Smith said: He says he cut me on account of some damn lies I had told. Don't know what they were. He wouldn't tell me who I told them to. I was in his daddy's barn. Went there to see his daddy. He just jumped on me and started cutting me; didn't say a word. Gladys Lea and Mrs. Lea were there. Mr. Lea was there. Mr. Lea didn't say anything out of the way to me. Gladys and Mrs. Lea tried to get me to go back

home. No one was in it or had anything to do with it except Charlie. He told John Rutland to tell me to come over there; said he wanted to make friends. I reckon he had accused me of so much, he thought he ought to make friends again. When I got there he was inside the dairy barn. I was just outside. He came out; didn't say a word; grabbed me and started cutting. I got hold of him and stopped the cutting as soon as I could. He didn't cut me after I got ahold of him."

Miss Berry testified that, from the time deceased entered the hospital until his death, he had no hope of recovery. She based this statement on the fact that he said to her as many as a half dozen different times that he had no hope of recovery. However, she testified to no statement of this character made by the deceased on the day of his death. The dying declaration admitted by the trial court was made on the day of his death.

Miss Beasley testified that on the morning of the day of his death she talked to him about his condition. The deceased knew Miss Beasley and knew her mother. He was anxious to see her mother, who was expected to visit the hospital. Miss Beasley testified that on that morning Miss Vaughan stated to her in the presence of deceased that the latter was going to die, or was dying; that he did die that afternoon; that after hearing Miss Vaughan's statement that he could not recover the deceased expressed the fear that he would die before being able to see Miss Beasley's mother. She testified further that he had no hope of recovery, judging from his statements.

Miss Vaughan testified that, about half past six o'clock on the morning of the day of the death of the deceased, she asked him how he felt, to which he replied, "Very well." Then she said to him, "You are a very sick man, and it is probable you will not live through the day. Do you realize this?" He said, "Yes; I reckon so." Miss Vaughan testified, further, that she asked the deceased to tell her how the homicide happened, the facts in reference to it, and stated in that connection that such a statement from him would probably "help your loved

ones after you are gone;'' that he closed his eyes and said he would tell her later. Miss Vaughan then left the room. Later she was informed that the deceased had begun to make a statement of the facts and circumstances of the homicide. She testified that she hurriedly returned to his room, and standing with a pencil and tablet where he could not see her, took down the statement above. She admitted that the deceased did not know she was in the room at the time,¹ and there was nothing to show that he knew his statement was being taken down.

It will be observed from the testimony of these three nurses, that although the deceased expressed no hope of recovery at any time, nevertheless, just a little while before making the dying declaration, he stated that he felt very well, and when Miss Vaughan urged him to make a statement of the facts of the homicide he said he would do so later, and when she informed him that he could not recover and would probably die before night he said, ''Yes; I reckon so.''

A dying declaration is made without the sanctity of an oath and without an opportunity to cross-examine the declarant. To take the place of that sanctity and that right there must be an undoubting belief in the mind of the declarant, at the time the declaration is made, that death is upon him. If it shall appear in any manner that there was hope of recovery, however faint it may have been, still lingering in his breast, the required sanctity is not afforded, and the statement cannot be received. The belief by the declarant that he may ultimately die as a result of his injury is not sufficient to authorize the admission of his statement as a dying declaration. The predicate must exclude all hope of life. It must reach the point of absolute certainty in the mind of the declarant. All hope must be gone. He must feel sure that the finger of death is upon him. *Wilkerson* v. *State,* 134 Miss. 854, 98 So. 770; *Haney* v. *State,* 129 Miss. 486, 92 So. 627; *McNeal* v. *State,* 115 Miss. 678, 76 So. 625; 1 R. C. L. 539, section 82.

We are of the opinion that the dying declaration in this case does not meet the requirements of the law. The testimony of the three nurses that the deceased had no hope of recovery was based, as shown by their testimony, more on their opinion as to his state of mind than on what he said. But the state of mind of the deceased at the very time of making the dying declaration is of controlling consideration, regardless of what his state of mind had been before. ·Just before and at the very time of making the alleged dying declaration deceased did not express absolute conviction that death was impending. When told that it was, he said, ''I reckon so,'' and shortly before that he said he felt very well, and when urged to make a statement as to how the homicide took place he said he would do so later. This condition of mind did not show that all hope was shut out; that there was no hope, however faint. On the contrary, as we view the evidence, when the alleged dying declaration was made, the deceased had hope of recovery, notwithstanding Miss Vaughan was telling him there was no hope. Instead of agreeing with her outright he said, ''I reckon so.'' We think this evidence should not have been admitted. It was calculated to have a potent influence on the jury, and doubtless did. We think the action of the court was reversible error.

Other assignments of error are argued on behalf of appellant. It may be that some of them are well founded. They were not harmful to appellant, however, and will probably not occur again on another trial of this cause.

*Reversed and remanded.*