258 So.2d 423 (1972)
Billy Joe KIDD
v.
STATE of Mississippi.
No. 46661.
Supreme Court of Mississippi.
February 21, 1972.
Murray L. Williams, Water Valley, C.D. Thomas, Pontotoc, for appellant.
A.F. Summer, Atty. Gen., by Timmie Hancock, Sp. Asst. Atty. Gen., Jackson, for appellee.
BRADY, Justice:
This is an appeal from the Circuit Court of Pontotoc County, Mississippi, wherein the appellant, Billy Joe Kidd, was indicted by the grand jury for the crime of murder. He was tried at the November 1969 Term and was convicted of manslaughter and sentenced to serve ten years in the state penitentiary. From that verdict and sentence the appellant appeals to this Court.
On the night of December 7, 1968, the deceased, Jimmy Crausby, sometime between the hours of eight and nine o'clock, received stab and cut wounds which resulted in his death approximately five hours later. The father of the appellant, Walter Kidd, received two gunshot wounds which resulted in his death a few days later. Billy Joe Kidd, the appellant, was shot twice, one bullet shooting off the appellant's right index finger near the first joint, and the second bullet entering the left chest area near the heart and making its exit in the appellant's back just below the left shoulder blade.
On Friday night, December 6, 1968, Mr. Jimmy Crausby made a telephone call to the appellant's home requesting that the appellant meet with him to discuss something important. Because of company, the *424 appellant was unable to meet with Crausby on that night. However, he agreed to meet with him the following night. It was agreed that they would meet at a poolroom in town, and from there they would go somewhere else to talk. The family of the appellant was greatly upset, especially appellant's sister, Dot Kidd. They all attempted to persuade the appellant not to meet with Crausby. Dot Kidd was so disturbed about her brother's safety that she requested the Chief of Police, Jim Hubbard, to try to persuade him not to have the meeting. The family was unable to persuade the appellant not to meet with Crausby. In order to keep his father, Walter Kidd, from worrying, the appellant told him to remain at the store and that he would report by means of a citizen's band radio whether Mr. Crausby was alone and if he (appellant) was being followed. By means of this citizen's band radio, the appellant kept Walter Kidd informed as to where he was at all times. The "discussion" which finally took place had some of the hallmarks of a duel that lacked all the laws and rules of the Code Duello. Dot Kidd also had a citizen's band radio in her automobile and thus she and appellant's daughter Debby, and his mother, Mrs. Walter Kidd, who were riding in Dot's car, were able to learn where the appellant was and where he was to meet Jimmy Crausby.
The record reveals that the meeting took place east of Pontotoc at a hill commonly known as "Dynamite Hill," which is approximately a mile to a mile and a half west on Old Highway 6 near its intersection with New Highway 6. The appellant and Crausby each drove his individual car to the location on Dynamite Hill. The record reveals that the appellant then announced over the citizen's band radio, "[I]t's happening, now," or "[I]t's happening." They parked their cars side by side facing a gate to the entrance of the road running down to what is known as the "dynamite house."
The record establishes that the appellant left his car and entered the car of Jimmy Crausby and that Jimmy Crausby accused the appellant or his father of having someone telephone his wife. Crausby then began cursing the appellant and reached down on the left side of the car under the seat and picked up a 38 caliber snubnose revolver, where his wife kept it. At this point a struggle took place, and the appellant, because he had both arms free and was sitting on the right side of the front seat, managed to take the pistol away from Jimmy Crausby. The appellant then unloaded the revolver, taking out all six cartridges. He dropped or threw them on the rear floorboard of Crausby's automobile and threw the revolver over onto the back seat. Mr. Ladell Luther, Sheriff of Pontotoc County, and Chief Hubbard found five rounds of unspent ammunition on the back floor of Jimmy Crausby's automobile, and Highway Patrolman Eubanks found the unloaded 38 caliber revolver on the back seat.
The appellant testified that after sitting and talking with Jimmy Crausby a little longer, Crausby became enraged again. He (Crausby) suddenly went over the back of the seat into the rear of the car and reached under the front seat immediately behind the appellant to obtain what the appellant believed to be another gun. At this point the appellant leaped over the seat and began struggling with Crausby. While they were struggling in the back seat, the appellant heard a vehicle drive up and stop. He then heard his father, Walter Kidd, call his name, "Joe." The appellant testified that he called to his father that Jimmy had a gun in his hand and to go away or he may get shot. Appellant further testified that something then hit him on the tip of his right ear and he was rendered unconscious.
The next thing that the appellant remembered was that he was lying face down on the back seat with his feet facing the left rear door. He tried to raise up, and heard three gunshots. The shots were within the car and they were fired by Jimmy Crausby. Appellant testified that he *425 saw the gun in Crausby's hand and that his father, Walter Kidd, was inside on the right front seat of the car leaning over the back of the seat. The appellant grabbed for the gun but Crausby pulled the gun back and fired, shooting off the appellant's right index finger. Then Jimmy Crausby was able to push the gun against the appellant's chest, and he laughed as he pulled the trigger, shooting the appellant through the left portion of his chest. Once again Jimmy Crausby placed the gun to the chest of the appellant, laughed and pulled the trigger, but this time, the appellant testified, he heard a loud click. He remembered that five shots had been previously fired.
The sheriff and chief of police found a 41 Magnum pistol on the back seat of the appellant's automobile that had five spent cartridges and one live cartridge. The record also establishes the fact that the 41 Magnum pistol had blood on it and that it belonged to appellant's father, Walter Kidd.
At approximately this time, the car which was driven by the appellant's sister, Dot, arrived at the scene. With Dot Kidd was her mother, Mrs. Walter Kidd, and appellant's twelve year old daughter, Debby Kidd. Their testimony, while somewhat confusing, substantially is that when they stopped the car Debby and Dot jumped out and started toward the parked vehicles, which were the two cars that belonged to Jimmy Crausby and the appellant and the truck owned by Walter Kidd. Dot Kidd testified that Jimmy Crausby came running toward her and tried to catch her but that she "ducked" him and he ran and got in her car, spun the wheels and drove off with Mrs. Walter Kidd in the car. Debby Kidd testified that the first person she saw was Jimmy Crausby and that he grabbed Mrs. Walter Kidd and forced her to get in their car and then drove off. Mrs. Walter Kidd does not remember whether she got out of the car. She remembers that Jimmy Crausby got in the car. They drove down to the intersection of Old Highway 6 and New Highway 6 and it was at this point that Dot Kidd's car was stopped and Mrs. Walter Kidd jumped out and ran back toward Dynamite Hill. Jimmy Crausby was seen at the intersection by several witnesses, and an ambulance was called which carried him to the Pontotoc County Hospital.
The first person on the scene was Officer Buddy Brandon. Mr. Brandon is a special investigator of the police force of Memphis, Tennessee. He was visiting his parents, Mr. and Mrs. Earl Brandon, whose home is approximately two hundred yards from the intersection of Old Highway 6 and New Highway 6. On the night of December 7, 1968, when he heard someone call for help, he believed there had been a car wreck at the intersection and ran to the intersection. When he arrived sometime between eight and nine o'clock, he noticed one white female and one white male whom he later learned were Mrs. Walter Kidd and Jimmy Crausby, respectively. He testified that Jimmy Crausby was lying on the edge of the pavement and that there was a lot of blood on his clothing, face and neck. Mr. Brandon testified that he did not conduct an examination, but that he "saw that he (Jimmy Crausby) had some type wound in his stomach, and it was open and looked like part of his intestines were showing." He also testified that Mrs. Walter Kidd was in a state of shock and he attempted to calm her. Mr. Brandon heard Jimmy Crausby say, "I am dying. Somebody help me to the hospital. You all are going to let me lay here until I die. I am cold."
One Reverend William Dowdy was the next person to arrive on the scene. He testified that he was a minister and lived near Booneville. He is generally familiar with the area of Pontotoc County, and on the night of December 7, 1968, he approached said intersection and observed a car about halfway out into the westbound lane. He stated that the headlights of the car were on and there was a man in front of the car; that the man was "on his *426 knees and it looked like he was trying to stand up, he was awful bloody." Reverend Dowdy testified that he was the first to arrive at the scene, but that a crowd of people came up later. He further testified that Jimmy Crausby was conscious when he arrived and that he evidenced a concern for Crausby's welfare. Reverend Dowdy testified that Jimmy Crausby had said, "Please don't let me lay here and die, because people have died from lack of attention and all." He further testified that once again, after being told that he would have to wait for an ambulance before he could be moved, Jimmy said, "Please do something now," and that before he left in the ambulance he stated, "Don't let me lay here and bleed to death, I am cut bad." When asked by someone who had cut him, he first replied "Billy and Honey," and later replied "Billy and Walt." This testimony was allowed into evidence by the trial court on the grounds that it was a dying declaration. The admission thereof is one of the errors assigned by the appellant in this appeal.
Dot Kidd and Debby Kidd managed to get Billy Joe Kidd into Billy Joe's car and took him to the hospital. They were unable to get Mr. Walter Kidd to leave with them. Mr. Walter Kidd evidently drove himself in his truck to the hospital since Jim Hubbard, Chief of Police of the City of Pontotoc, testified that when he arrived at the hospital he found Walter Kidd standing by a stretcher and that Walter Kidd stated he had been shot.
Sheriff Ladell Luther testified that he had found a coat on the back seat of Jimmy Crausby's car and an unloaded 38 caliber revolver, which was found to belong to Linda Crausby, the wife of Jimmy Crausby. Five live shells of ammunition for a 38 caliber revolver were found on the floor of the Crausby car. The sheriff testified that he inspected Jimmy Crausby's car and observed what appeared to be two bullet holes in the windshield and also what appeared to be a bullet hole in the top of the left side of the car. In addition to the above items a small oblong object, resembling a roll of coins wrapped in tape, and an opened knife were found on the floor of Jimmy Crausby's automobile. Sheriff Luther testified that he could detect no stains of blood on the knife when he found it. Jimmy Crausby died from stab wounds approximately five or six hours later, and Walter Kidd, the father of the appellant, died several days later from two gunshot wounds inflicted at the scene by Crausby.
The appellant, Billy Joe Kidd, was tried on the indictment for murder and was convicted of manslaughter. From that conviction the appellant appeals, assigning numerous errors. Those errors urged by appellant which merit our consideration in deciding the issues in this case are as follows:
1. The court erred in admitting into evidence a so-called dying declaration made by the deceased, Jimmy Crausby.
2. The court erred in refusing, denying, and not permitting the appellant to make his record.
3. The court erred in granting state's requested instructions, numbers two, three, five and eight.
4. The court erred in overruling defendant's motion for a new trial.
Appellant in support of his first error assigned urges that the trial court erred in admitting the statement made by the deceased, Jimmy Crausby, to Reverend Dowdy as a dying declaration. The appellant vigorously objected to all this testimony and was overruled by the trial judge. The basis upon which the appellant contends that these statements should not have been admitted is that they completely failed to meet the prerequisites necessary to make the statements admissible in evidence under our established rule relating to a dying declaration. In support of the contention that the statements made by James Crausby to Reverend Dowdy did not constitute a dying declaration, the appellant points out that this Court in the recent case of Houston *427 v. State, 246 Miss. 77, 149 So.2d 331 (1963) set forth once again the criteria and requirements for admitting into evidence a statement as a dying declaration. This Court said that the question as to whether or not a declaration is to be admitted as being a dying declaration is not what other people thought concerning whether or not the deceased would die, but whether the deceased himself thought he was going to die. This Court also quoted from Lea v. State, 138 Miss. 761, 770, 103 So. 368, 370 (1925), as follows:
A dying declaration is made without the sanctity of an oath and without an opportunity to cross-examine the declarant. To take the place of that sanctity and that right there must be an undoubting belief in the mind of the declarant, at the time the declaration is made, that death is upon him. If it shall appear in any manner that there was hope of recovery, however faint it may have been, still lingering in his breast, the required sanctity is not afforded, and the statement cannot be received. The belief by the declarant that he may ultimately die as a result of his injury is not sufficient to authorize the admission of his statement as a dying declaration. The predicate must exclude all hope of life. It must reach the point of absolute certainty in the mind of the declarant. All hope must be gone. He must feel sure that the finger of death is upon him.
This Court in Houston v. State, supra, relied upon the case of Baylis v. State, 182 Miss. 794, 183 So. 527 (1938), and pointed out as follows:
[T]hat experience shows that dying persons have made false self-serving declarations; and in quoting with approval from a case from another state, this Court pointed out that dying declarations are dangerous and that they are not so strong a safeguard against falsehood as they were when the rule admitting them was first laid down. (246 Miss. at 84, 149 So.2d at 334.)
In addition, in Simmons v. State, 206 Miss. 535, 538, 40 So.2d 289, 291 (1949), the Court said:
The true test is that "at the time the declaration was made, the deceased believed that he was going to die and had no hope whatsoever of recovery, it must be made under the realization and solemn sense of impending death."
Paraphrasing and summarizing the holdings in these three cases we point out that just as the damned who enter the portals of hell are required to abandon all hope, so the person making the declaration must have abandoned, at that time, all hope that he can live. If there is a glimmer of hope in his breast, regardless of how dim or feeble the ray may be, nevertheless, the statements of the person making the declaration are not admissible in evidence. This is so because there is not a firm, abiding belief that the angel of death has spread his pinions over him, has taken his hand and now leads him into "the undiscover'd country from whose bourn no traveller returns."
An objective but careful analysis of all the statements made by Crausby to persons when he was at the intersection clearly reveals that he was in no fear of impending death. He earnestly solicited Reverend Dowdy and possibly others who arrived at the scene to promptly carry him to the doctor. His statements were of concern and not of despair; of hope of recovery; of hope not to lie there and die; of hope to get to a hospital and to obtain the services of a doctor so that he would not lie there and ultimately die. His statements clearly reveal a continuing desire to be moved to a hospital with the hope of recovery, which hope was more than a faint hope.
Appellee urges that the rule as set forth in Rouse v. State, 222 So.2d 145 (Miss. 1969) and Fulton v. State, 209 Miss. 565, 47 So.2d 883 (1930), should control. We are of the opinion, however, that the rules *428 governing the admission in evidence of a denying declaration as set forth in Lea v. State, supra, Baylis v. State, supra, and Simpson v. State, supra, are more in keeping with our long established requirements governing the admissibility of dying declarations. In these cases the admissibility of the declarations are based upon the absolute knowledge of the declarant that death is imminent. These cases are controlling in the case at bar. Factually the case at bar can be distinguished from Rouse v. State, supra, and Fulton v. State, supra, which are not overruled by this opinion.
The appellant submits in support of his second assigned error that when the appellant called Jim Hubbard, Chief of Police of the city of Pontotoc, the trial judge, after he excused the jury, refused to allow counsel for appellant to make his record as to a conversation that took place between Walter Kidd, father of the appellant, and Chief Hubbard on December 8, 1968. Appellant urges that even though the objection of the state might have been well taken and the refused testimony may or may not have been admissible as evidence, counsel for the appellant had the right and duty to make his record. The failure of the trial judge to permit counsel for the appellant to make his record in this cause is a grievous error. Regardless of whether or not the testimony is irrelevant, immaterial and unnecessary, the defendant and the state have the sacred right of appeal to this Court. The corollary thereof is the right to make their respective records and no court should deny a litigant the right to make his record so that we will have before us all issues of fact as well as issues of law for review. This in itself is error sufficient to justify a reversal of this case. Hitt v. State, 217 Miss. 61, 63 So.2d 665 (1955).
The appellant urges in error number three that the trial court erred in granting certain instructions. Instruction No. 2 that was granted consists of the so-called "don't have to know" instruction. This instruction has been severely criticized for a number of years by this Court, but it was not until Pryor v. State, 239 So.2d 911 (1970) that this Court finally reversed and granted a new trial because of the granting of this instruction. In December 1970 in Nobles v. State, 241 So.2d 826 (Miss. 1970) this Court again admonished the district attorneys to refrain from using this instruction and held that the rule condemning the "don't have to know" instruction will not be considered to be retroactive, but where this instruction has been used in the circuit court after September 28, 1970, the rule in Pryor v. State, supra, is applicable and is reversible error. However, this case was tried on November 11 through 14, 1968, and thus does not fall under the ruling of Pryor.
The granting of Instruction No. 3 to the state is error because the evidence in the record does not justify the facts as set forth in the instruction. Presumptions must be utilized to supply the essential facts enumerated in this instruction. On a retrial of this cause the erroneous instructions should not be requested or given.
This Court has continuously criticized the granting of instructions dealing with abstract principles of law. The state's Instruction No. 5 states an abstract principle of law as follows:
The Court instructs the jury for the State that each person present at the time of, and consenting to and encouraging the commission of a crime, and knowingly, wilfully and feloniously doing and (sic) act which is an ingredient in the crime, or immediately connected with it, or leading to its commission, is as much a principal as if he had with his own hand committed the whole offense. *429 This instruction does not set forth facts upon which the jury can apply the rule of law announced therein. This leaves to the jury's discretion how this instruction should be interpreted and it is possible to have twelve different interpretations of the abstract principles of law, assuming that the jurors understood and were sufficiently skilled in determining legal questions to apply the instruction correctly. It is debatable whether or not this instruction was cured by any instruction given the appellant and it was unnecessary for the state to obtain this instruction and it was error to grant it.
The state's Instruction No. 8 correctly instructs the jury as to what verdicts it may bring in if it finds the appellant guilty.
As to appellant's fourth assignment of error, that the trial court erred in overruling appellant's motion for a new trial for the reasons and errors previously discussed, it is obvious that the motion for a new trial should have been granted.
It is unnecessary for this Court to determine whether or not the rule as announced in Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933), has application here and we expressly do not do so. Nevertheless, we point out that when the Weathersby rule has been invoked and applied the defendant or his witnesses are the only eye witnesses to the homicide. Their version was reasonable and it was not substantially contradicted in material matters by credible witness or by the physical facts or by facts of common knowledge. This record fails to reveal that anyone actually saw the infliction of the stab and cut wounds which caused the deceased's death. The appellant himself testified that he did not see his father shot and he did not see Jimmy Crausby cut. It is unnecessary, therefore, for us to consider in this opinion whether the Weathersby rule has application, even though physical facts corroborate parts of the appellant's testimony.
The basic issues properly presented by the evidence in this case upon which proper instructions were granted were issues of fact for determination by the jury. The jury found the defendant guilty of manslaughter and the trial court did not err in refusing to grant a peremptory instruction in favor of the appellant under the evidence in this cause. However, because of the foregoing errors which were committed, this case must be reversed and remanded for a new trial. On a retrial, the errors heretofore committed can be avoided.
Reversed and remanded.
RODGERS, P.J., and PATTERSON, SMITH and SUGG, JJ., concur.
SMITH, Justice (concurring):
I concur in the reversal of this case because of the erroneous admission of the so-called dying declaration.
In this connection, I deem the time has arrived when the whole question of the admission of this type of hearsay evidence should be reexamined.
Perhaps, at the time that this exception was engrafted upon the exclusionary hearsay rule, it was not too violent an assumption to suppose that every dying man, who realized that he was dying, entertained a devout belief in divine judgment and punishment after death and that this justified the admission into evidence against an accused of his statements, without benefit of oath, notwithstanding that it deprived the accused absolutely of any opportunity to cross-examine him, and also of his constitutional right to be confronted by the witnesses against him. Moreover, the witness who plays the role of conduit in testifying to these supposedly sanctified statements will be, more often than not, a relative, friend or confidant of the deceased, whose testimony is subject to all of *430 the human frailties of poor recollection, misunderstanding and downright dishonesty, as well as to the very human motivations of revenge or ill will against the alleged slayer.
Napoleon is reported to have said that Mohammed was a success because he invented a religion without any hell. Today, considering all of the many, many denominations of the Christian faith alone and their different concepts and teachings, and leaving out of consideration entirely the millions who, sadly enough, profess no religious faith whatever, as well as the multiplied millions who adhere to Buddhism, Confucianism and other non-Christian faiths, can it be said that a man who has been wounded and feels that he is dying, is by those circumstances alone automatically stripped of all human malice, anger and desire for revenge and is transformed ipso facto into a devout believer in a life after death and in divine punishment? I cannot think so. Certainly, an accused should not be deprived of his constitutional right to confrontation by the witnesses against him on a theory that meets neither the test of reason nor of the facts of common knowledge and human experience. This harmful effect of the admission of this type of hearsay is enhanced by a recital of dramatic circumstances under which the statement is alleged to have been made, and, the law having in effect declared this type of hearsay sacrosanct, there is no effective way to challenge its truth and it is more than just likely that the jury will attach undue importance to it and give it undue weight in arriving at a verdict.
It is my opinion that the admission of this type hearsay evidence should not be countenanced by the courts in any case, but certainly, in criminal cases, where a man may lose his liberty as the result of it, it should never be admitted.
PATTERSON, J., concurs in this opinion.