FULTON *v.* STATE.

Division A.   Oct. 9, 1950.

No. 37617 (47 So. (2d) 883)

John S. Holmes, for appellant.

**George H. Ethridge**, Assistant Attorney General, for appellee.

**Smith, J.**

Appellant was convicted of the murder of James Pearce, and sentenced to the penitentiary for life. He appealed to this Court, where he assigns only one error, i. e., ''the action of the trial court in refusing to admit the testimony of Melvina Greer, Irene Oliver, Callie Luster, Beatrice Smith and Alva James Peyton as to the statements made by deceased on his death bed to the effect that Eugene Thurmond had shot him.''

Eugene Thurmond was also indicted, separately, for the murder of James Pearce, but was permitted to plead

guilty of manslaughter, receiving a sentence of three years in the penitentiary.

There is a confession, in the record, allegedly made by appellant in which he admitted that he killed the deceased, without which there was probably no sufficient proof of his guilt. On the witness stand he repudiated the confession, claiming that Eugene Thurmond was the slayer, and that he was forced to make the alleged confession by Thurmond, who threatened to kill him, if he refused to acknowledge his having shot Pearce. See Johnson v. State, 107 Miss. 196, 65 So. 218, 51 L. R. A., N. S., 1183; Whip v. State, 143 Miss. 757, 109 So. 697; Draughn v. State, 76 Miss. 574, 25 So. 153. This testimony was not contradicted, and it may be said to appear that appellant was laboring under the duress of this fear, when he made his statement later to the owner of The Grille and to the officers, who, themselves, were not guilty of any force, threats, or promises to induce it. Moreover, the effect of the original threat of Thurmond was not shown to have been removed at the time. Whitley v. State, 78 Miss. 255, 28 So. 852, 53 L. R. A. 402.

Thurmond was a psychopathic, paranoid type with homicidal tendencies, which is uncontradicted in the record. Thurmond himself told several people after his arrest that he shot Pearce, although seeking also to implicate the appellant. The purported confession of the latter followed the communication to him, by the officers, of Thurmond's charges against him.

Objection was made to the admission of the confession, but it was overruled. Its admission is not assigned as error here. However, if the alleged dying declaration of the deceased had been admitted, as will later be discussed, appellant's repudiation of the confession would have been corroborated, as well as his claim that it was made under duress.

The three men, Thurmond, the appellant, and the deceased, after a night of revelry and drinking, repaired to the bedroom of deceased, back of his employer's place

of business. The deceased proposed that he would rob the cash register, and divide the proceeds. After some colloquy, in which appellant claims to have opposed it, the deceased did perpetrate the robbery.. In a sudden affray, the result of a quarrel over the division of the loot, Pearce was shot and killed. It is evident that it was unpremeditated, and the result of sudden anger. Appellant requested a charge to the jury limiting the verdict to conviction of no higher crime than manslaughter, which was refused. This refusal is not assigned as error here, so we pretermit further discussion of it. With this background, we deem it necessary to deal hereinafter only with the statements of Thurmond, the testimony of the doctor, the proffered evidence of the five persons as to the dying declaration, and the dying declaration itself.

When the doctor reached the scene of the shooting, he found Pearce in a speechless condition, with a wound in the lung near his heart. He was then unconscious. Furthermore, some of the big blood vessels were cut, severed by the pistol bullet. Four hours later Pearce died at the hospital. Nevertheless, before death he regained consciousness. The doctor said that upon regaining consciousness Pearce could know he was dying, from his condition and the nature of his wounds.

The events at the hospital, pertinent to the issue raised by the assignment of errors, all occurred within approximately thirty minutes.

But, before entering there, it is interesting to consider what Eugene Thurmond, who did not testify at the trial of this case, had to say as to who shot Pearce, the deceased. When the owner of The Grille, the scene of the shooting, was handed the pistol by Thurmond, he stated "I shot James." Later, it is true he declared, "We shot James." Furthermore, after the shooting, Thurmond did most of the talking to the officers investigating the case, the appellant saying nothing until handcuffed, and then "just followed along with" Thurmond's story. On the stand, appellant denied that he did the shooting, charging

it to Thurmond, who used a pistol belonging to the owner of The Grille. He also corroborated the latter's statement that Thurmond handed back to him his gun, stating, "I shot James Pearce."

A deputy sheriff testified that Pearce was in a dying condition, when he was sent to the hospital. The doctor also testified to the same effect, declaring that Pearce himself could know it, if he regained consciousness, so that he was actually on his deathbed, when the events, excluded by the court, occurred at the hospital, in a period of thirty minutes before deceased lapsed into a coma. Pearce requested the nurse to turn him over, and she refused to do so before the doctor came for fear of accelerating his bleeding. Pearce is not shown to have attempted to turn himself over. On what was his deathbed, he exclaimed, "I just can't make it," which were his last words. The court asked the witness, an attache of the hospital, "Did you ever hear this man say anything about dying?" To which she replied: "No more than saying he couldn't make it." All of this was in the absence of the jury.

In this situation, and the facts thereof are concurred in by all of the five witnesses named in the assignment of error, he was asked by each of them, including the ambulance driver who brought him to the hospital, "Who shot you?" He invariably replied that it was Eugene Thurmond. He said it was over money. And it was over money. He was clearly rational during his thirty minutes of consciousness. He gave his mother's and his own name and address correctly. None of these witnesses, offered by the appellant, knew him, and they were strangers to him, without interest in the case. On objection by the State, the court excluded this testimony from the jury, and thereby committed, we think, reversible error. His reason manifestly was that Pearce did not expressly declare he was dying, in so many words.

If the deceased had tried to turn himself over, either before or after he requested the nurse to do so, there would

be reasonable plausibility to an argument that his statement meant only that he could not turn himself over. But he made no such effort, and it was not until he was refused and told to wait until the doctor came, that he said: "I can't make it." He was dying then, and according to the doctor, capable of knowing such to be the fact, and we are of the opinion that the evidence is sufficient to prove it, and that he meant he was dying. ■■ There is ample authority that such consciousness on the part of a dying man may be inferred from the circumstances, although nothing was said respecting death, as set forth in such cases as Morrow v. State, 168 Ga. 575, 148 S. E. 500, which we cite as to that point only. See also McNair v. State, infra.

The rule is laid down as: "It is well settled that the sense of impending death which a dying person must have had in order to render a dying declaration made by him admissible in evidence may be inferred from the nature of the wound or the state of his illness, without any express declaration to show that he was sensible of impending death. It is clear, however, that this rule does not mean that the inference may be drawn from the mere fact that the wound, in the opinion of the man of science, was in point of fact mortal, but means that the nature of the wound or the illness should have been such as to affect the knowledge and control the opinion of the dying person himself, as to the danger to which he stood exposed. ■■ Evidence of a physician's opinion as to a declarant's condition at the time of making declarations is admissible not only to show the latter's state of mind, where such opinion was communicated to him, but also to show that the declarant was actually in a condition from the very nature of which he would have had a sense of impending death." 26 Am. Jur., Homicide, Sec. 421. ■■ In a case where the dying declaration was offered by the State, and not the defendant as in the case at bar, this Court has said: "The State's main reliance for conviction were Culpepper's dying declarations. He lived

only a few hours after he was shot. Several witnesses testified that Culpepper made statements in their presence which, if true, showed he had been murdered by appellant. These statements were sufficiently qualified to justify their admission. The evidence showed, or tended to show, that when they were made Culpepper was mortally wounded and realized it, and, further, that death was then upon him—that he was in extremis." Conway v. State, 177 Miss. 461, 171 So. 16, 17. The Court reversed the case, but not because of the admission of the dying declarations.

The rules governing the admission of dying declarations are thoroughly discussed in Lipscomb v. State, 75 Miss. 559, 23 So. 210, 230, and need not be repeated here. In the case at bar this challenged and rejected evidence was offered by the defendant, as stated.

There are several Mississippi cases dealing specifically with dying declarations of the injured party, exculpating the defendant, and being offered in evidence by the defendant. A dying declaration was excluded because the evidence about it was conflicting, and the court believed the evidence against it. We said in discussing the declarations: "The deceased, a few days before her death, made certain declarations which while not entirely specific and were vague in a certain degree, yet were sufficient, if otherwise competent, for submission to the jury as tending to exculpate [the defendant] of blame, and as corroborating his testimony and that of the other witness introduced in his behalf." Scott v. State, 166 Miss. 6, 148 So. 239, 240. In the case at bar, there was no contradiction of the evidence as to the dying declaration offered by the appellant, and that condition in the Scott case is not before us here.

However, we cite, as interesting, that Wharton's Criminal Evidence, Vol. 1, Sec. 553, contains this statement: "It is said in an English case that a declaration in favor of the accused must ever be taken as more likely to be true, as it is not probable that one would make a state-

ment favorable to the person who has inflicted a mortal injury upon him, but rather the contrary. The general rule that dying declarations speak only to the facts, and not to matters of opinion, has been relaxed where the opinion expressed by the deceased was favorable to the accused, in explanation of the conduct of the deceased, and hence the declaration that the accused would not have struck the deceased if the latter had not provoked him is competent, as also the direct declaration by the deceased showing that the killing was done by another person.'' We think the part of the foregoing quotation announcing the general rule is applicable to the instant case.

Furthermore, in commenting on a dying declaration, offered on behalf of the defendant, we have said: ''If Dr. Cranford's statement that the deceased was conscious of the fact that he was dying be treated as a mere expression of opinion by the witness, still we think it is manifest from the declarations of the deceased, and all attendant circumstances, that he was then under a sense of immediate and impending death, and that this dying declaration should have been admitted in evidence. These declarations of the deceased were material and very favorable to appellant's defense, and we think the exclusion thereof constituted reversible error. Green v. State, 89 Miss. 331, 42 So. 797.'' McNair v. State, 171 Miss. 358, 157 So. 908, 909.

In the case at bar, in view of what we have said, we think the exclusion of the testimony of the five witnesses, named in the assignment of error, requires the reversal and remand of the case for a new trial.

Reversed and remanded.