413 So.2d 734 (1982)
Charles FUSON
v.
STATE of Mississippi.
No. 53360.
Supreme Court of Mississippi.
May 5, 1982.
*735 Travis T. Vance, Jr., Eugene A. Perrier, Vicksburg, for appellant.
Bill Allain, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, ROY NOBLE LEE and HAWKINS, JJ.
ROY NOBLE LEE, Justice, for the Court:
Charles Fuson was indicted and tried in the Circuit Court of Warren County, Honorable John E. Ellis, presiding, on a charge of murder. He was convicted of manslaughter and sentenced to twenty (20) years with the Mississippi Department of Corrections, from which sentence and judgment he appeals to this Court.

I.
Did the lower court err in admitting statements by the deceased into evidence as dying declarations?
Appellant and Mary Fuson, the victim, had been married for nineteen (19) years and had reared sixteen (16) children, all from previous marriages. On November 20, 1980, Mary Fuson left appellant and went to live with one of her children, Debbie McMillian, because of infidelity on the part of her husband. Appellant operated an auto repair shop adjacent to the Fuson home. Mrs. Fuson returned to the residence at periodic intervals.
Mrs. Fuson continued to live with her daughter, but on the night of December 8, 1980, she went to the home of Johnny and Peggy McMillian, at their invitation, to stay overnight. One of her other children called appellant to ascertain the whereabouts of Mrs. Fuson, stating that she wanted to inform her that a family friend had died. Appellant called several people attempting to find his wife and also made efforts to locate her the next morning.
On December 9, 1980, Mrs. Fuson returned to Debbie McMillian's home about 8:30 a.m. for the purpose of changing her clothes. She seemed to be in a good mood and drove to the home of another daughter, Mary Ann Riley, to get her purse, having left it at the Riley residence the night before. She drank coffee there and Mrs. Riley gave her some children's dresses to sell in her retail used clothing business. Mrs. Fuson told her daughter she was going to the Fuson home when she left.
Mrs. Fuson drove into the driveway of the Fuson home, exited the automobile and went inside. About 11:30 a.m., Mrs. Betty Lou Ables was driving a van vehicle north on Culkin Road near the Fuson home. She saw a woman, later identified as Mrs. Fuson, running out into the middle of the street toward the van. She was waving her hands for Mrs. Ables to stop. Mrs. Ables stopped the van, rolled down the window and inquired as to whether she could render any help. She noticed that Mrs. Fuson had blood on her blouse and pants and when she attempted to steady herself by holding onto the side mirror of the van, she said, "I've been shot. Please take me to the hospital." Mrs. Ables told her to sit down and she would call an ambulance, whereupon, Mrs. Fuson replied, "Please don't leave me here. Take me to the hospital right now. Please, I'm going to die." Mrs. Fuson then fell back upon the street. As she fell, an automobile driven by Constable Herbert Stokes, who lived on the same street as the Fusons and knew them, arrived on the scene. He found Mrs. Fuson lying on the pavement and asked her, "Well, who shot you?" She answered, "Chuck [her husband] shot me." Mrs. Fuson also told Stokes that after she was shot, she laid down, played dead, and, when her husband left, she ran out.
Soon thereafter, Sheriff Paul Barrett arrived, preceding the ambulance, and went to Mrs. Fuson's side. She recognized him and Sheriff Barrett asked her what happened. Mrs. Fuson said, "Paul, take me to the hospital. I'm dying. Chuck shot me." Sheriff Barrett asked her why appellant shot her. She told him they had been having *736 some marital problems and that she had moved out of the house. When Mrs. Fuson came home that morning, appellant demanded that she tell him where she had been living. When she refused to tell him, he shot her. The officers conducted a search of the house and surrounding area and no knife, gun or other weapon was found. The officers searched the woods and area around the house for several hours in an attempt to find appellant, but their efforts were in vain.
Earl Fuson, son of appellant, returned to his own home that night and discovered appellant standing in his living room. Earl Fuson asked appellant if he knew Mrs. Fuson had been shot five (5) times. At first, appellant did not answer, and then he said that he and Mrs. Fuson had an argument, she shot herself and he ran out the back door. Appellant did not mention anything about shooting his wife in self-defense.
When Mrs. Fuson was taken into the emergency room, Dr. Herman Kellum examined her. He told her that it would be necessary to perform exploratory surgery within her abdomen and that such an operation had a high risk and could be fatal. Dr. Kellum stated she accepted it, but did not respond. Mrs. Fuson spontaneously told Dr. Kellum that her husband, appellant, had shot her three (3) times and she fell to the floor. She also told him that she pleaded with her husband not to shoot her any more because she was dying. Dr. Kellum's surgery revealed that Mrs. Fuson had five (5) entry gunshot wounds. There were two (2) wounds in the chest, one (1) in the abdomen, and others in the lower right leg and right arm. The pancreas and other internal organs within the abdominal region were injured. Mrs. Fuson lived for five (5) days and died of pulmonary insufficiency as a direct result of the gunshot wounds.
Expert evidence indicated that the projectiles removed from Mrs. Fuson's body came from a .32-caliber Smith & Wesson revolver, similar to one owned by appellant (the murder weapon was not found). The evidence also indicated that the gun inflicting the wounds was fired at close range. Appellant testified, and his evidence indicated, that decedent had threatened his life previous to the day of the homicide; that he went into the Fuson home and his wife attacked him with a knife. Pertinent parts of his testimony, taken from the abstract, follow:
I walked in the front door and she was sitting on the couch in the dining room. Before I could say anything, she jumped up and moved toward me waving a knife in the air. She said, "I'm going to fix you for calling me. I'm just going to kill you." She backed me up until I was cornered. The couch partially blocked my path to the doorway. I stood up on the couch and pulled out my pistol [a .32-caliber Smith & Wesson]. I said, "Mary, please don't do that. Let's talk this over." She replied, "I'm going to kill you. I'm going to cut your guts out." She just kept waving the knife at me and I pushed it off with my gun. I pleaded with her to stop. When she came at me again I shot her in the right arm in an attempt to disarm her. It seemed to have no effect on her, because she continued to come at me with the knife, so I shot her in the lower right leg. She just kept coming and shouting, "S.O.B.S.O.B." She was acting wild. I panicked and when she was about three feet away from me, I started shooting. I don't know how many times I shot, but when I stopped, I ran out the back door. I though she was chasing me because I never saw her fall. She knew how afraid I was of knives. Once I saw an uncle decapitated with a knife. I was only 13 years old at the time. I ran into the woods behind my home and it was raining and cold. I did not have a jacket. I wandered about in the woods and eventually got lost. I must have slipped, fell and hit my head, because when I awoke, I had a bump on my forehead. I wandered out to the highway and recognized where I was. I walked a short distance upon the road to the home of my son, Earl Fuson. The door was unlocked, so I stepped inside and waited. I must have lost the gun in the woods.
*737 The appellant argues that the statements admitted into evidence, made by Mrs. Fuson to Mrs. Ables, Constable Stokes, Sheriff Barrett and Dr. Kellum, do not qualify as dying declarations and constitute reversible error. In Clark v. State, 398 So.2d 229 (Miss. 1981), the requirements for establishing the bases for admission of dying declarations into evidence was stated as follows:
The essentials for a statement to constitute a dying declaration are: (1) the wounded person is in extremis, and dies after making the statement, (2) the person realizes that he is mortally wounded, and (3) he has no hope of recovery. [398 So.2d at 230].
Also see Lea v. State, 138 Miss. 761, 103 So. 368 (1925).
Without discussing this question further, we are of the opinion that the statements of Mrs. Fuson were admissible as dying declarations. Also, those statements, except the statement to Dr. Kellum, were admissible as a part of the res gestae, they having been made at a place and time which were closely connected to the shooting itself. The statements to Dr. Kellum were a repetition of the statements made to the other individuals, and, in our opinion, were cumulative and not prejudicial, even though they may not have been admissible as a dying declaration.

II.
The appellant argues that the Weathersby rule applies and that his version of the homicide should be accepted. For obvious reasons, the Weathersby rule does not apply, and there is no merit in that contention.
There being no reversible errors in the trial below, the judgment of the lower court is affirmed.
AFFIRMED.
PATTERSON, C.J., SUGG and WALKER, P. JJ., and BROOM, BOWLING, HAWKINS, DAN M. LEE and DARDEN, JJ., concur.