492 So.2d 1281 (1986)
Charles WATTS,
v.
STATE of Mississippi.
No. 56,367.
Supreme Court of Mississippi.
July 23, 1986.
*1283 J.W. Miller, Biloxi, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Henry C. Clay, III, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and ROBERTSON and SULLIVAN, JJ.
SULLIVAN, Justice, for the Court:
CHARLES WATTS was convicted in the Circuit Court of the Second Judicial District of Harrison County, of the murder of Thomas McDonnell and sentenced as an habitual offender to life imprisonment by the Honorable James E. Thomas, Circuit Court Judge.

I.

DID THE SECOND TRIAL VIOLATE APPELLANT'S CONSTITUTIONAL RIGHT AGAINST DOUBLE JEOPARDY?
Watts was indicted in February, 1983, for the November 22, 1982, murder of Thomas McDonnell. His first trial was had on October 3, 4, and 5 of 1983, and it ended in a mistrial. On the third day of the first trial, a Wednesday, during the case for the prosecution, Watts moved for a mistrial, alleging that on the previous day articles had appeared in two local newspapers that mentioned that Watts was being tried as an habitual offender and that the victim was allegedly shot for failing to pay Watts for guns. Watts alleged that this information was given to the press by Bruce Dunnagan of the Biloxi Police Department. The trial judge in the first trial noted that, if true, that was a violation of Rule 4.01(1), Uniform Criminal Rules of Circuit Court Practice, dealing with pretrial publicity.
After reading the articles, the trial judge stated that it was not necessarily clear that Dunnagan had revealed the information. Officer Dunnagan testified and admitted that he had talked by phone to a reporter on Monday or Tuesday morning of the same week. The reporter had called about the Watts case. Dunnagan testified that all he told her was what was already known: the victim's and the defendant's names, where the shooting took place and that it was a shotgun shooting. Dunnagan testified that when the reporter requested information about the status of Watts as an habitual offender he referred her to the district attorney's office. He did, however, explain the habitual offender statute to her. Dunnagan admitted that he told the reporter that Watts "allegedly shot the victim for failing to pay for guns." The trial court overruled the motion at that time.
At the conclusion of the prosecutor's case, Watts made a motion for a directed verdict, which was overruled. Watts then requested to be allowed to re-argue the motion for mistrial. His motion for mistrial based on the breach of Rule 4.01 was *1284 overruled, but the trial court then polled the jury on the question of their having read the article.
Five of the jurors admitted reading the newspaper the night before. Watts moved to strike four of those jurors who at the least admitted that they glanced at the headline of the article involved. Counting the two alternates, this only left ten jurors. Watts again requested that a mistrial be granted and the trial court granted the mistrial.
On October 5, 1983, the trial court entered an order granting the mistrial because four jurors had not followed the court's instruction to avoid media coverage of the trial, and as such raised a question as to the purity of the jury verdict because the newspaper articles asserted that the appellant had prior convictions. The trial judge had also stated from the bench that the proof showed that the police officer had violated 4.01(1) concerning not disclosing a person's prior record to the media.
Prior to the second trial, which started on December 12, 1983, Watts filed a motion to dismiss, alleging that it was Officer Dunnagan who had disseminated the information to the newspaper as it pertained to his prior criminal record and that such was in violation of Rule 4.01(1). He contended that the violation necessitated the mistrial and, because of that, to retry Watts would constitute double jeopardy.
At the hearing on this motion, a different trial judge presided. Argument was had, and the trial judge himself called the reporter responsible for the story to the stand.
The reporter was familiar with the habitual offender statute and her testimony was that she first learned of the fact that Watts was being tried as an habitual offender when she asked the district attorney's office and they checked their files and found that he was an habitual offender. She had also seen the indictment in the circuit clerk's office. Her recollection was that in her conversation with Dunnagan she asked him if Watts was an habitual offender and he referred her to the district attorney's office. At this time she already knew about the habitual offender statute, even if Dunnagan did explain it to her.
At the conclusion of the hearing, the trial judge stated that the first judge had granted the mistrial because of the jurors' failing to follow his instructions to avoid media coverage of the trial. The trial judge found that neither the state nor its representatives committed any deliberate misconduct or tried to get before the jury any facts.
The double jeopardy prohibition does not mean that every time a trial aborts or does not end with a final judgment the defendant must be set free. Schawarzauer v. Miss., 339 So.2d 980, 982 (Miss. 1976).
However, if a mistrial is granted upon the court's own motion, or upon the state's motion, a second trial is barred because of double jeopardy unless there was a manifest necessity for the mistrial, taking into consideration all the circumstances. Jones v. State, 398 So.2d 1312 (Miss. 1981). Some examples of manifest necessity are: failure of a jury to agree on a verdict, Jones at 1315; biased jurors, Id.; an otherwise tainted jury, Id. at 1318; improper separation of jury, Schwarzauer, supra; when jurors otherwise "demonstrate their unwillingness to abide by the instructions of the court", Schwarzauer, 339 So.2d at 982.
Even if the state does not move for a mistrial, the involvement of the state is relevant in determining whether a second trial is barred. See Carter v. State, 402 So.2d 817, 821-22 (Miss. 1981); Jones, supra.
In this case, Watts moved for the mistrial. In Carter v. State, supra, the Court, following Divans v. California, 434 U.S. 1303, 98 S.Ct. 1, 54 L.Ed.2d 14 (1977) (Rehnquist, Circuit Justice), held as follows:
In order to elevate an order granting a mistrial in a criminal case at the request of the defendant to one which could form *1285 the basis of a claim of double jeopardy, it must be shown not only that there was error, which is the common predicate to all such orders, but that such error was committed by the prosecution or by the court for the purpose of forcing the defendant to move for the mistrial. Justice Rehnquist, as Circuit Judge, Divans v. California, 434 U.S. 1303, 98 S.Ct. 1, 54 L.Ed.2d 14 (1977)... .
Under the standard noted by Justice Rehnquist, in his denial of the application for stay in Divans v. California, supra, the mistrial in the present case, on motion of appellant, although not opposed by the State, does not appear to have been made or granted in bad faith or for an improper purpose by either the judge or the prosecutor, and therefore, appellant's plea of double jeopardy did not bar retrial of the defendant.
Id., 402 So.2d at 821 (citations omitted).
In Carter, the mistrial was granted to the defendant, with no objection from the state, because it was discovered that witnesses who had already testified were relating what had transpired to sequestered witnesses who had not testified. The defendant later attempted to withdraw the motion but the trial court denied this request.
The mistrial in this case was granted on the ground that the jurors failed to follow the trial judge's instruction to avoid media coverage of the trial. Though the police officer's action was found to be a contributing factor, it is not shown by this record, nor did the trial judge find, that the "[police officer's] ... error was ... calculated to force applicant to move for a mistrial." Divans v. California, 439 U.S. 1367, 99 S.Ct. 39, 58 L.Ed.2d 75 (1978). There was no showing of bad faith on the part of anybody connected with the state having to do with the release of information to the reporter.
This assignment of error is without merit.

II.

DID THE COURT ERR IN ALLOWING INTO EVIDENCE STATEMENTS MADE BY THE VICTIM?
The evidence at trial was that McDonnel was shot in front of his trailer home by an assailant situated underneath the trailer. The appellant, who McDonnel and his wife knew as Charles McVey, had been to the trailer the day before when an argument ensued because of McDonnel's failure to produce the proceeds from guns the appellant had given him to sell. Just prior to the murder McDonnel's wife was coming home and saw the appellant walking on a road near the trailer. McDonnel made statements after he was shot that Charles McVey had shot him. McDonnel's wife described his car to the police. The appellant was stopped in his car and arrested nearby. The gun used to shoot McDonnel was found near the trailer. A fingerprint found on the stock matched that on the appellant's left ring finger.
Prior to the first trial, Watts filed a motion in limine for an order instructing the district attorney to refrain absolutely from making any reference to statements made by the victim at the time of his death because the victim did not believe he was going to die, and he had hope of recovery. Watts further alleged that these statements were motivated by revenge and ill will based on prior association, that the jury would give undue importance to the statements and that the statements were not given under the requisite consciousness. Watts took the position that an ordinary objection would prejudice him and that an instruction by the court afterwards would not be sufficient to undo the prejudice.
At the hearing on the motion, Jessie Stevenson testified that he lived in his trailer behind the McDonnells. On the day of the killing, he heard three shots and looked out his trailer and could see McDonnell lying on the ground. He ran from the trailer toward the victim and he could see that the victim was bleeding badly. Stevenson returned to his trailer and got a belt to use as *1286 a tourniquet. Stevenson asked McDonnell, "Do you know who shot you?" McDonnell responded, "Charlie McVey" or "Charles McVey". The victim also told Stevenson that the man had threatened him and his family the previous week.
Stevenson testified that McDonnell appeared to be going into shock. He also said that about three times before the paramedics got there the victim's eyes started to roll to the back of his head, and Stevenson had to shake him because he thought the victim was going then. The victim never became completely unconscious, although he appeared close to it several times. After the victim told Stevenson who had shot him, the victim said, "I think I'm dying", and his eyes started to roll up.
John Vanek testified that he was with the Biloxi Police Department and lived in the same trailer park as McDonnell. He arrived at the scene in a matter of seconds. The victim was semi-conscious and was badly injured. Vanek testified that the victim's left shoulder was almost separated from his body and there were wounds in the stomach area. The victim stated to Vanek, without him having to ask, that "Charlie shot me". Vanek then asked, "Charlie who?" And the victim said, "Charlie McVey". Vanek testified that the victim, though hysterical, was concerned that the ambulance was not getting there in time to help him.
The victim's wife testified that when she heard the shots she ran outside and saw the victim flat on his back and that he never sat up. His left shoulder was totally mutilated and the insides of his stomach were hanging out. She heard the victim tell Vanek that "Charles McVey" had shot him. Her testimony was that her husband was coherent, that it appeared that he was in hope of recovery, that he thought he was all right and that he was not going to die. She based this on the fact that he was so coherent and that he was more worried about the kids; he had told her to get them out of the trailer.
Vanek was recalled, and he testified that the victim said, "It was getting dark, that he found himself going up."
One of the paramedics testified that when he arrived on the scene the victim appeared to be in severe shock due to a large blood loss. The statements had already been made. The victim had no audible blood pressure, but had palpable carotid pulse. The paramedic's testimony was that the victim appeared to be aware of what was going on and who the paramedics were, and that by his actions the victim was not aware of how serious his injuries were.
The trial judge overruled the motion, finding beyond a reasonable doubt that the dying declarations were admissible. He largely based this finding on the inference that the victim was aware of the severity of his wounds.
Prior to the second trial, Watts re-urged his motion against introduction of the dying declarations, and the same arguments were presented. Additionally, Watts argued that the victim was a narcotics' addict and that he might have been under the influence of narcotics at the time of the declarations. He also argued that there was an inadequate showing of a connection between Watts and the name Charles McVey. The court again overruled the motion, deferring to the earlier ruling concerning admissibility, and held that the two new arguments went to credibility and not admissibility.
The testimony at trial included the above witnesses' testimony that the victim stated that Charlie McVey shot him. By stipulation, another neighbor's prior testimony was introduced which also was that the victim stated that Charlie McVey shot him. Stevenson also testified that the victim told him that Charles McVey had threatened his family the previous week and that he said he was going to get even.
The doctor who treated the victim at the hospital testified that when the victim arrived, which was approximately one hour after the shooting, his blood pressure was zero. The victim could not communicate. *1287 There were massive injuries to the abdomen. The spleen was shredded and there were massive injuries to one of the kidneys. The large and small bowel had massive injuries also. The victim died approximately four hours after he arrived at the hospital, or approximately five hours after he was shot.
The general requirements concerning the admissibility of dying declarations are as follows:
1. The wounded person is in extremis and dies after making the statement,
2. The person realizes that he is mortally wounded, and
3. He has no hope of recovery.
Fuson v. State, 413 So.2d 734 (Miss. 1982); Clark v. State, 398 So.2d 229 (Miss. 1981). Compare Miss.R.Evid. 803(2), 804(b)(2) (effective January 1, 1986).
In Clark, supra, when the witness first arrived at the scene after the shooting, he saw no blood on or around the victim and did not know what was wrong with the victim. The victim did not say that he knew or thought he was mortally wounded or that he was about to die. The Court stated the requirements mentioned above and then discussed other cases dealing with dying declarations, particularly concerning the victim having to believe that he was going to die and having no hope whatsoever of recovery. The Court said the following:
In Simmons v. State, 206 Miss. 535, 40 So.2d 289 (1949), the Court said:
"Deceased was lying in road at the scene of the tragedy, and two witnesses for the State testified he said to them, `They hit me with the binders, they pushed me off the truck.' Neither witness claimed that deceased made any statement indicating on his part that he knew or believed death was then and there imminent and impending. One witness said that he, himself, knew it and that the dying man should have known it. That is not the test. The true test is that `at the time the declaration was made, the deceased believed that he was going to die and had no hope whatever of recovery, and must be made under the realization and solemn sense of impending death.' Syllabus McNeal v. State, 115 Miss. 678, 76 So. 625." 206 Miss. at 538, 40 So.2d at 291.
The Court discussed dying declarations in Houston v. State, 246 Miss. 77, 149 So.2d 331 (1963), and stated that the question as to whether a declaration is to be admitted as being a dying declaration is not what other people thought concerning whether or not the deceased would die but whether the deceased himself thought that he was going to die. Quoting from Lea v. State, 138 Miss. 761, 103 So. 368 (1925), the Court in Houston further stated:
"`A dying declaration is made without the sanctity and without an opportunity to cross-examine the declarant. To take the place of that sanctity and that right there must be an undoubting belief in the mind of the declarant, at the time the declaration is made, that death is upon him. If it shall appear in any manner that there was hope of recovery, however faint it may have been, still lingering in his breast, the required sanctity is not afforded, and the statement cannot be received. The belief by the declarant that he may ultimately die as a result of this injury is not sufficient to authorize the admission of his statement as a dying declaration. The predicate must exclude all hope of life. It must reach the point of absolute certainty in the mind of the declarant. All hope must be gone. He must feel sure that the finger of death is upon him.'" 246 Miss. at 82, 149 So.2d 333.
Id. at 230.
The Court in Clark went on to say that the "knowledge of impending death may be inferred from the nature and extent of the wound inflicted upon the victim." See also, Rouse v. State, 222 So.2d 145, 148 (Miss. 1969).
*1288 "[T]he sense of impending death ... may be inferred from the nature of the wound ... without any expressed declaration to show that he was sensible of impending death." Clark at 231 (quoting Fulton v. State, 209 Miss. 565, 569, 47 So.2d 883, 885-86 (1950)).
In Clark, we held that there was no indication that the victim knew or thought he was mortally wounded and about to die. There was no obvious wound at the time the witness saw the victim, and the type of wound involved made it probable that the victim did not know the seriousness of his condition. We held that it was not a dying declaration and reversed.
The following is a brief summary of the other relevant rules concerning dying declarations.
1. The dying declaration exception to the hearsay rule is largely a rule of necessity. Dean v. State, 173 Miss. 254, 160 So. 584 (1935); Lipscomb v. State, 75 Miss. 559, 23 So. 210 (1897); Merrill v. State, 58 Miss. 65 (1880).
2. The trial judge must find beyond a reasonable doubt that the out-of-court statements were indeed dying declarations. Houston v. State, 246 Miss. 77, 149 So.2d 331 (1963); Hardeman v. State, 216 Miss. 115, 125, 61 So.2d 797, 802 (1953); Bayliss v. State, 182 Miss. 794, 183 So. 527 (1938). Dying declarations should be admitted with great caution because of their inherent weaknesses, e.g., not made under oath, no opportunity to cross examine, opportunities for revenge, chances for misstatements, etc. See Hardeman, supra; Bayliss, supra; Lipscomb, supra; Merrill, supra.
3. Though the trial judge must determine that the statements are dying declarations beyond a reasonable doubt, such questions are traditionally left to his sound discretion and he will not be reversed unless an abuse of discretion. Rouse v. State, 222 So.2d at 148.
4. The court should be more lenient when the defendant wants the statements in because they are exculpatory. See Fulton, supra. But compare Hardeman, supra.
5. Upon request, a defendant is entitled to an instruction pointing out to the jury that the inherent character of a dying declaration restricts it to less weight than live testimony. Lipscomb, supra. However, the instruction cannot be a comment on the particular evidence involved.
6. To be admissible the declarations must come from one of sound mind. Walton v. State, 156 Miss. 499, 126 So. 29 (1930). And the declarations must not be actuated by malice, revenge, etc. See Marley v. State, 109 Miss. 717, 69 So. 210 (1915). In general, the testimony must be otherwise competent and relevant as with testimony from a living witness. Walton, supra; Guest v. State, 96 Miss. 871, 52 So. 211 (1910); Lipscomb, supra.
7. The statements admitted are to be restricted to the act of killing, and the circumstances immediately attending it and forming a part of the res gestae. Marley, supra; Lipscomb, supra.
8. Generally, dying declarations going to the state of mind of the declarant are admissible both because they are relevant to competence/admissibility of the declarations as a whole, and to the weight to be given the declarations by the jury. Dean, supra; Wilkerson v. State, 134 Miss. 853, 98 So. 770 (1923).
9. As pointed out before, the declarations should be confined to the act of killing and the circumstances immediately attending it and forming a part of the res gestae; however, objections must be specifically made to the incompetent parts. If part of a dying declaration is admissible, but part is not, and there is no objection to the part that is not, the objection is waived. Whittington v. State, 160 Miss. 705, 135 So. 190 (1931); Wilkerson, supra; Lipscomb, supra.
10. The declarations must not be statement of opinions but only statement of facts. Lipscomb, supra. If it be a reasonable construction that it is a statement of fact, it is admissible if otherwise it is a *1289 dying declaration. Lipscomb, supra. However, in making this determination the Court is not restricted to the literal form of the words, e.g., "I know", as opposed to "it is my opinion". Instead, the determination as to whether the statements are ones of fact or opinion must be made from all the surrounding circumstances. Id.
11. Generally, the trial judge, in determining the admissibility, should hear all the evidence bearing on the issue. However, if he refuses to hear some relevant evidence, the Supreme Court may review the whole record and if the evidence admitted at trial shows that the statements were indeed competent, no reversible error occurred. Wilkerson, supra. Correlatively, if the appellant desires, all the qualification evidence can be reintroduced to the jury in order for the jury to take such into account in weighing the evidence. Conway v. State, 177 Miss. 461, 171 So. 16 (1937).
The essential contention of Watts on appeal is that the victim did not understand that he was near his death, and that he had not lost hope of recovery. He relies heavily on Kidd v. State, 258 So.2d 423 (Miss. 1972). In Kidd, the declarant received stab and cut wounds and died five hours later. The victim stated that he was dying. He also pled for the witnesses to get him to the hospital. The Court said the following:
[J]ust as the damned who enter the portals of hell are required to abandon all hope, so the person making the declaration must have abandoned, at that time, all hope that he can live. If there is a glimmer of hope in his breast, regardless of how dim or feeble the ray may be, nevertheless, the statements of the person making the declaration are not admissible in evidence. This is so because there is not a firm, abiding belief that the angel of death has spread his pinions over him, has taken his hand and now leads him into "the undiscover'd country from whose bourn no traveller returns."
An objective but careful analysis of all the statements made by Crausby to persons when he was at the intersection clearly reveals that he was in no fear of impending death. He earnestly solicited Reverend Dowdy and possibly others who arrived at the scene to promptly carry him to the doctor. His statements were of concern and not of despair; of hope of recovery; of hope not to lie there and die; of hope to get to a hospital and to obtain the services of a doctor so that he would not lie there and ultimately die. His statements clearly reveal a continuing desire to be moved to a hospital with the hope of recovery, which hope was more than a faint hope.
258 So.2d at 427.
Watts' contention is based on the testimony of the victim's wife that the victim himself did not understand how badly he was injured, and that he expressed hope of recovery because he was concerned about the ambulance arriving and getting medical attention. He further expressed concern about his children.
We apply the rationale of Neal v. State, 451 So.2d 743, 753 (Miss. 1984), in which we held that when the trial judge's determination is largely based upon a finding of fact, and he applied the correct legal standards, his determination should not be overturned unless his findings of fact were clearly erroneous, as not being supported by substantial evidence. Here the judge's finding that the statement was admissible as a dying declaration was supported by substantial evidence. The case is factually similar to Fuson, wherein the victim, though certainly in extremis, pleaded for someone to take her to the hospital. We affirmed the trial court's finding that her statements were dying declarations.
We note that the testimony of Stevenson that the victim told him that Charlie McVey had threatened his family the previous week and told them that he was going to get even was not admissible as part of the dying declaration; however, no specific objection was made to it. Whittington, supra; Wilkerson, supra; Lipscomb, supra.
On that authority the admission of the dying declaration was not erroneous.

*1290 III.

WAS IT REVERSIBLE ERROR BECAUSE THE PROSECUTION FAILED TO PROVIDE DISCOVERY AS ORDERED?
Watts had filed a discovery motion and obtained an order granting him, among other things, a list of the witnesses the state intended to offer. Watts contends that reversible error occurred since the name of Charlie McVey did not appear on the list and that the defense was not otherwise notified that he would be called. He relies upon Box v. State, 437 So.2d 19 (Miss. 1983).
A Charles McVey was called to testify as the last witness in the state's case in chief. Obviously his name is the same as that of who the victim said shot him, and who the evidence tended to show as being the name that Charles Watts used when introduced to the victim and his wife. The real McVey who testified was a narcotics officer on the coast and whose testimony was offered to show that he did not know Tommy McDonnell, and that it certainly was not him that the victim was referring to.
McVey's name does not appear on the witness list provided by the state, nor was he called on the first trial. However, defense counsel did not object when McVey was called, nor did appellant raise the point in his post-trial motion for j.n.o.v. or a new trial.
This Court recently fully adopted the guidelines for use when discoverable but undisclosed evidence is offered by the state. The first guideline is relevant here. It is as follows:
In cases where the state seeks to offer into evidence that which it ought to have disclosed pursuant to a discovery request but didn't, it is first incumbent upon the defendant to make timely objection. If this be done, the court's initial response should be a directive that the defense be given a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs, etc. The court should not be grudging in this allowance.
Gray and Nations v. State, 487 So.2d 1304 (Miss. 1986).
This assignment is barred because Watts failed to object to the testimony of McVey. Furthermore, the record indicates that on two occasions during the case the state verbally informed the court and Watts that Charlie McVey was a remaining witness that they intended to call. On the first occasion the defense counsel had asked who the state still had that they intended to call. The prosecutor replied, "Charlie McVey". Defense counsel then responded, "well, I knew that."
This assignment is without merit.

IV.

WAS THE APPELLANT ERRONEOUSLY SENTENCED AS AN HABITUAL OFFENDER?
Watts contends that the indictment in the record shows that he was not indicted under the habitual offender act. He cites Rule 6.04 of the Uniform Criminal Rules of Circuit Court Practice, which does require that the "indictment must include both the principal charge and a charge of previous convictions", and must allege with particularity concerning the previous convictions.
The indictment in the original record does not make any reference to previous convictions. However, a suggestion of diminution of record was granted by this Court on July 10, 1985. The record was completed by a certified copy of the indictment with the habitual offender portion attached thereto. This complies with Rule 6.04(1).
From the record it is clear that both Watts and his attorney were aware that he had been indicted as an habitual offender. Furthermore, Watts did not object to being sentenced as an habitual offender, and he did not raise this ground in any of his post-trial motions.
For the first time, in his reply brief, Watts argues that, if the court sustained *1291 the suggestion of diminution of record, the sentencing was erroneous anyway because it failed to comply with the requirements set forth in Debussi v. State, 453 So.2d 1030 (Miss. 1984).
New matters cannot be raised for the first time in a reply brief. Overstreet v. Allstate Ins. Co., 474 So.2d 572, 577 (Miss. 1985). Furthermore, Watts is procedurally barred from raising this issue on appeal, since it was not listed as grounds in his motion for j.n.o.v. or a new trial. Pool v. State, 483 So.2d 331, 336 (Miss. 1986). Nor did he object at trial when the evidence was introduced; this also waives the objection. Sumner v. State, 316 So.2d 926 (Miss. 1975).
There is no merit to this assignment of error.
The conviction of murder and sentence of life imprisonment as an habitual offender are affirmed.
AFFIRMED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, ANDERSON and GRIFFIN, JJ., concur.