# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-KA-00978-SCT

*ELTORY HAWKINS a/k/a ELTORY CORDARRA HAWKINS a/k/a ELTORY C. HAWKINS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/14/2022 |
| TRIAL JUDGE: | HON. CELESTE EMBREY WILSON |
| TRIAL COURT ATTORNEYS: | LUCIUS EDWARDS |
| | ARTHUR HUGO CALDERON |
| | EDGAR DALE WILLIAMS, JR. |
| | ROBERT R. MORRIS |
| | TRENA MONIQUE WILLIAMS |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KATY TAYLOR SARVER |
| DISTRICT ATTORNEY: | ROBERT R. MORRIS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/10/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., ISHEE AND GRIFFIS, JJ.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1. A jury found Eltory Hawkins guilty of one count of sexual battery and of two counts of fondling, all three committed against his girlfriend's minor daughter. The Desoto County Circuit Court sentenced him to thirty-five years' imprisonment for sexual battery, to ten years' imprisonment for each count of fondling (twenty years) to run consecutively with the thirty-five years and concurrently with one another, and to five years' post-release

supervision. He was also required to register as a sex offender. Finding no error, we affirm Hawkins's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2. Jane and her two daughters, Lily and Anna,[1] lived with Hawkins, who was not the biological father of either minor child, from November 2012 to March 2016. For one of those years, from August 11, 2014, to August 11, 2015, Hawkins was incarcerated for a felony conviction unrelated to this case.

¶3. On October 15, 2020, Lily and Anna, aged fourteen and sixteen at the time, confided in their mother that Hawkins had engaged them sexually when they and Hawkins lived under the same roof. The next day, Jane sought help from Officer Henry Minor of the Olive Branch Police Department, a school resource officer responsible for relaying student safety concerns to the police department.

¶4. Officer Minor referred the matter to Detective LaQuanna Wesley, who interviewed and took a written statement from Jane on October 19, 2020. Detective Wesley then contacted the Mississippi Department of Child Protection Services, which scheduled forensic interviews of Lily and Anna at the Healing Hearts Child Advocacy Center on October 27, 2020.

¶5. Hawkins was subsequently indicted on March 10, 2021. The final iteration of the

---

[1] Fictitious names are used for the mother and her two daughters to protect the anonymity of the minor children.

indictment charged Hawkins with six counts that allegedly occurred between February 28, 2014, and March 31, 2016: (1), (2), and (3) sexual battery of Lily in violation of Mississippi Code Section 97-3-95(1)(d) (Rev. 2014); (4) and (5) fondling of Lily in violation of Section 97-5-23 (Supp. 2015); and (6) sexual battery of Anna in violation of Section 97-3-95(1)(d).[2]

¶6.     Hawkins's first trial was held on March 28-29, 2022. Following empanelment of the jury and testimony by multiple State's witnesses, the circuit court became aware of juror misconduct. First, the court observed juror 86 showing notes to and speaking to another juror. Second, a juror told bailiffs that juror 86 had spoken to other jurors regarding the case and how they would later vote. Third, a bailiff witnessed juror 86 and an audience member communicating. Based on these instances of misconduct, the circuit court dismissed juror 86 and replaced her with an alternate, juror 126.

¶7.     Another juror issue arose when Hawkins called Teresa Quinn as a witness. Immediately after Quinn took the stand, juror 3 notified the court that she knew Quinn from work. Juror 3 was then called to testify in chambers. But she maintained she could remain fair and impartial.

¶8.     After both parties had an opportunity to examine juror 3, the State moved for a mistrial, citing juror 86's misconduct and the risk of juror 3's becoming unfair and partial.

---

[2] The State moved ore tenus to amend the indictment twice, once prior to Hawkins's first trial and again during the first trial. It first moved to change the victim in count 6 from Lily to Anna. The circuit court entered an order granting the change on March 10, 2022. It next moved to change the end of the date range from December 31, 2016, to March 31, 2016. The circuit court entered an order granting the change on March 29, 2022.

Over Hawkins's objection, the circuit court subsequently granted the State's motion and entered an order declaring a mistrial on March 29, 2022. In its order, the circuit court found, in relevant part:

> 2.    On the afternoon of March 28, 2022, a juror was released from duty as a result of disruptive and/or inappropriate behavior and potential communication with members of the audience. This behavior was reported by Court personnel, and reported to the Court Bailiffs by another juror. The Court witnessed likewise some of this conduct.
>
> 3.    On the morning of March 29, 2022, another jur[or] disclosed they had a potential conflict with a witness called to the stand to testify for the Defense.
>
> 4.    In light of the issues that existed on March 28, 2022, with potential taint of the jury, and in light of the ongoing concerns of the Court as to whether this jury has been affected by these matters, the Court finds no other option to declare a mistrial in this case.

¶9.    Following the mistrial, Hawkins's second trial was set for November 14, 2022. In the interim, Hawkins filed a motion to dismiss his case on October 15, 2022. He claimed that a second trial would violate his constitutional right to protection against double jeopardy since no manifest necessity called for a mistrial in his first trial. Specifically, he argued that the circuit court's replacing juror 86 with an alternate evinced the lack of a manifest necessity and that juror 3's confirming she could remain fair and impartial negated any potential issues with her knowing a defense witness.

¶10.    The State filed a response to Hawkins's motion to dismiss on November 10, 2022. It claimed, in relevant part, that the circuit court "used its discretion in determining that the actions of juror [86] in attempting to communicate with other jurors about the case, coupled

4

with the revelation from juror [3] of her knowing the defendant's witness, was cause for a mistrial due to manifest necessity."

¶11. The circuit court held a hearing on Hawkins's motion to dismiss on November 14, 2022. Hawkins argued that the State's moving for a mistrial only after the issue with juror 3 arose was "too little too late[,]" that the State should have moved in direct response to juror 86's misconduct, and that juror 3 should have been replaced with an alternate just as juror 86 was. The circuit court ultimately denied Hawkins's motion, however. It stated in relevant part:

> I've never seen such open behavior in court that was against the [c]ourt's direction, against the [c]ourt's direction on multiple occasions without singling out a specific juror. There's no doubt that she was sharing her notes, Juror 86, with her neighbor. I saw her do it. I saw her motioning to somebody behind the defense table and making gestures. I couldn't see exactly who, but Deputy Harris indicated the same and then our two bailiffs that are jury bailiffs indicated that one of the jurors had reported to them that a juror had tried to speak with them inappropriately about the case. For those reasons, a mistrial was granted, and I think manifest necessity was there.

¶12. Hawkins's second trial proceeded two days later on November 16, 2022. The State called five witnesses: Officer Minor, who was unavailable to testify due to illness and whose testimony from Hawkins's first trial was read into the record; Detective Wesley; Jane; Lily; and Anna. Notably, Lily testified as follows:

| [The State]: | Now, [Lily], I'm sorry, but I have to ask you this. I need you to explain in detail what happened to you, and I want you to tell me - - in your own words, tell the jury what happened. |
|---|---|
| [Lily]: | [Hawkins] called me in the room. He told me to lock the |

5

door. He got on top of me, and he raped me.

[The State]:       You used the word rape. Now, did a part of his body touch your body?

[Lily]:            Yes.

                   . . . .

[The State]:       Okay. Can you describe which part of his body it was?

[Lily]:            His private part.

[Lily]:            All right. When you say private part, do you mean his genitals, his penis?

[Lily]:            Yes

[The State]:       Okay. What part of your body, if any, did he touch?

[Lily]:            My private.

[The State]:       Okay. Do you mean your vagina?

[Lily]:            Yes.

                   . . . .

[The State]:       Okay. So am I to understand that the defendant penetrated your vagina with his penis?

[Lily]:            Yes.

                   . . . .

[The State]:       Okay. Aside from what you described, your privates touching, did you touch him with any other part of your body?

[Lily]:            No.

6

[The State]:     Did you touch him with your hands?

[Lily]:          Yes.

[The State]:     Okay. What did you touch with your hands?

[Lily]:          His penis.

[The State]:     Okay. Was that the same time that this first happened?

[Lily]:          Yes.

                 . . . .

[The State]:     After that first time, did it happen again?

[Lily]:          Yes.

[The State]:     Okay. Do you recall the last time it was that it would have happened?

                 . . . .

[Lily]:          [Anna] was on the bed and I was on the bed asleep, and when my mama left, he came into the bed with me and [Anna], but he only did it to me.

                 . . . .

[The State]:     Okay. And what happened when the defendant came in the room with you?

[Lily]:          He started touching all over me and then he had sex with me.

[The State]:     Okay. Is that similar to what you described the first time that it happened?

[Lily]:          Yes.

7

[The State]:          Did he penetrate you with his penis?

[Lily]:               Yes.

[The State]:          Okay.  At that time, did you touch any other part of his body with any other part of your body?

[Lily]:               No.

¶13.   Once the state rested, Hawkins moved for a directed verdict, citing an alleged lack of witness credibility.   The circuit court denied the motion, however, and Hawkins rested without calling any witnesses.  The jury subsequently found Hawkins guilty of counts one, four, and five.  And the circuit court sentenced him on December 14, 2022.  Hawkins now appeals, raising three issues.

**DISCUSSION**

### 1.     Sufficiency of the Evidence

¶14.   Hawkins first claims, "[t]he evidence was insufficient to support more than one conviction for fondling between Count IV and Count V."  His claim is based on a single contention: "[t]he evidence . . . failed to establish beyond a reasonable doubt that [his] penis was placed in [Lily's] hands on two occasions."

¶15.   Regarding our standard of review,

> [a]n appeal of the trial court's denial of a directed verdict or judgment notwithstanding the verdict is a challenge to the sufficiency of the evidence that is subject to a de novo standard of review. ***Gilmer v. State***, 955 So. 2d 829, 833 (Miss. 2007) (citing ***Ivy v. State***, 949 So. 2d 748, 751 (Miss. 2007)). In reviewing the sufficiency of the evidence, this Court views all evidence in the light most favorable to the State and will reverse and render judgment in favor of the defendant "only if the facts and inferences 'point in favor of the

8

defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty . . . .'" *Young v. State*, 119 So. 3d 309, 313 (Miss. 2013) (internal quotation marks omitted) (quoting *Hughes v. State*, 983 So. 2d 270, 275-76 (Miss. 2008)).

*Haymon v. State*, 346 So. 3d 875, 881 (Miss. 2022).

¶16.    We look to the relevant element of the crime alleged in counts four and five. Pursuant to Section 97-5-23, the jury was instructed, on both counts, that it must find beyond a reasonable doubt that Hawkins "did place his penis into and/or against the hand of [Lily] . . . ." Reading Lily's testimony, we recognize that Lily did not explicitly detail a second instance of Hawkins's placing his penis into or against her hand. The only testimony that evinces a second instance is Lily's confirmation that her first sexual encounter with Hawkins "happen[ed] again."

¶17.    Hawkins argues the lack of detail accompanying Lily's confirmation requires reversal. But he is mistaken. Lily's confirmation was sufficient evidence. "It is well-established that a person may be found guilty based on nothing more than the uncorroborated testimony of a single witness." *Graves v. State*, 216 So. 3d 1152, 1161 (Miss. 2016). When viewing Lily's testimony in the light most favorable to the State and taking into account reasonable inferences, we hold that a reasonable juror could have found beyond a reasonable doubt that Hawkins was guilty of the relevant element of the two counts of fondling based solely on Lily's testimony. *Haymon*, 346 So. 3d at 881 (quoting *Young*, 119 So. 3d at 313). Lily testified that Hawkins penetrated her vagina with his penis and that she touched his penis

9

with her hands. She then responded yes when asked by the State whether those events had taken place more than once. Admittedly, her affirmative response does not provide specific dates or details, but her confirmation was clear enough that a reasonable juror could infer Lily's hands came into contact with Hawkins's penis a second time.

¶18. Indeed, Hawkins attacked Lily's credibility on cross-examination, eliciting that she was potentially confused as to her age during specific years. But "[w]e do not reweigh the evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Willis v. State*, 300 So. 3d 999, 1007 (alteration in original) (internal quotation marks omitted) (quoting *Little v. State*, 233 So. 3d 288, 289 (Miss. 2017)). Potential doubts about Lily's credibility therefore have no bearing on our sufficiency analysis.

### 2. Weight of the Evidence

¶19. Hawkins next claims "[t]he verdict on either Count IV or V was against the overwhelming weight of evidence." Regarding our standard of review,

> A request for a new trial is a challenge to the weight of the evidence. *Ivory v. State*, 283 So. 3d 108, 117 (Miss. 2019). The trial court's grant or denial of a new trial is reviewed under an abuse of discretion standard, and the evidence is viewed in the light most favorable to the verdict. *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017). This Court will overturn a jury verdict "only when it is so contrary to the evidence presented that to let it stand would sanction an unconscionable injustice. *Wilson v. State*, 936 So. 2d 357, 363 (Miss. 2006) (citing *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005), *abrogated on other grounds by Little*, 233 So. 3d at 291).

*Haymon*, 346 So. 3d at 883.

¶20. When asked if any other part of her body had touched Hawkins's body during their final sexual encounter, Lily answered no. Hawkins argues that her answer renders the jury's verdict against the overwhelming weight of the evidence. But Lily's answering no was strictly in response to questioning about her final sexual encounter with Hawkins and therefore does change that she confirmed that what had happened during the first encounter "happen[ed] again." Further, Hawkins presented no evidence to contradict Lily's claim that her hands touched Hawkins's penis more than once. We therefore hold that the circuit court did not abuse its discretion and that the jury's verdict was not against the overwhelming weight of the evidence.

### 3. Double Jeopardy

¶21. Hawkins last claims his "second trial violated his protection against double jeopardy." To this claim, we apply a de novo standard of review. *Cox v. State*, 134 So. 3d 712, 714 (Miss. 2014) (citing *Kelly v. State*, 80 So. 3d 802, 804 (Miss. 2012)).

¶22. We note that "[t]he double jeopardy prohibition does not mean that every time a trial aborts or does not end with a final judgment the defendant must be set free." *Watts v. State*, 492 So. 2d 1281, 1284 (Miss. 1986) (citing *Schwarzauer v. State*, 339 So. 2d 980, 982 (Miss. 1976)). "However, if a mistrial is granted upon the court's own motion, or upon the state's motion, a second trial is barred because of double jeopardy unless there was a manifest necessity for the mistrial, taking into consideration all the circumstances." *Id.* (citing *Jones v. State*, 398 So. 2d 1312 (Miss. 1981)). According to Hawkins, "no manifest necessity

11

existed to warrant the trial court's grant of the State's motion for a mistrial . . . ."

¶23.    As for what amounts to a manifest necessity, this Court has explained that

> there is no simple rule or formula defining the standard of "manifest necessity" or when exceptional circumstances exist justifying a declaration of mistrial by the trial court.  The question is not easily answered.  There are obvious cases of manifest necessity, e.g., a hopelessly hung jury, or a tainted jury, just as this case is an obvious case where manifest necessity to declare a mistrial was absent.  In the final analysis, the determinations must be made by the trial judge fulfilling his somber responsibility as to when justice requires him to declare a mistrial.

*Harris v. State*, 321 So. 3d 556, 561 (Miss. 2021) (quoting *Jenkins v. State*, 759 So. 2d 1229, 1235 (Miss. 2000)).  Further, manifest necessity can result "when jurors otherwise 'demonstrate their unwillingness to abide by the instructions of the court[.]'" *Watts*, 492 So. 2d at 1284 (quoting *Schwarzauer*, 339 So. 2d at 982).

¶24.    Here, the circuit court held the "potential taint of the jury" demanded it declare a mistrial.    The potential taint was based primarily on clear misconduct by juror 86—communicating with an audience member, sharing notes with other jurors, and asking other jurors how they would vote—which the circuit court itself observed in part.  We hold this misconduct presented a manifest necessity to declare a mistrial.  The circuit court, given juror 86's disregard of its standard pretrial instructions, could not confirm juror 86 had not influenced other jurors.  It could, however, confirm that other jurors had been subjected to violations by juror 86 that gravely endangered the individual fairness and impartiality on the part of each juror throughout the trial.  The circuit court was thus justified in concluding the jury may have been irreparably tainted.

12

¶25. That the circuit court initially replaced juror 86 with an alternate and that the circuit court did not question the jurors on juror 86's misconduct do not change this fact. The damage was done. Further, while juror 86's misconduct alone presented a manifest necessity, juror 3's knowing a defense witness only exacerbated the necessity. *See generally Box v. State*, 610 So. 2d 1148, 1151-53 (Miss. 1992) (holding a juror's failure to declare she knew and was related to a law enforcement officer created a manifest necessity for a mistrial when no alternate juror was available). We therefore hold that Hawkins's second trial did not violate his constitutional right to protection against double jeopardy.

## CONCLUSION

¶26. Hawkins's challenges to the evidence are without merit. And a manifest necessity warranted the circuit court's declaring a mistrial. We therefore affirm Hawkins's conviction and sentence.

¶27. **AFFIRMED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., MAXWELL, CHAMBERLIN, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**