# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00948-COA

**JAVONDUS BEASLEY A/K/A JAVONDUS M. BEASLEY**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/14/2021 |
| TRIAL JUDGE: | HON. ADRIENNE ANNETT HOOPER-WOOTEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/30/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., LAWRENCE AND EMFINGER, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     A Hinds County grand jury indicted Javondus Beasley (Beasley) for three counts of capital murder and one count of felon in possession of a firearm for the murder of Eldra Gibson, Ashley Taylor, and Sharrod Brown. In Beasley's first jury trial, he was found guilty of capital murder and two counts of second-degree murder. On appeal, this Court held that the denial of Beasley's request for a circumstantial evidence jury instruction was reversible error and reversed and remanded for a new trial. At his second trial, he was found guilty of

capital murder in Count One and second-degree murder in Counts Two and Three. The trial court sentenced Beasley to life imprisonment without eligibility for parole for capital murder and two terms of thirty years in custody to run concurrently for the two convictions of second-degree murder. Beasley appeals, raising three issues. First, he claims there was insufficient evidence for a rational trier of fact to find that the State met the elements of the crimes charged. Second, he argues the verdicts were against the overwhelming weight of the evidence. Finally, he asserts that under the *Weathersby* rule,[1] his version of the events had to be accepted as true, which would have necessitated a directed verdict or, in the alternative, his trial counsel was ineffective for failing to ask for a *Weathersby* instruction. Finding no error, we affirm.

**FACTS**

¶2. On October 30, 2013, Barbara Taylor dropped off her sister, Ashley Taylor, at Eldra Gibson's home, located at 175 Moon Street in Jackson, to visit Ashley's boyfriend, Sharrod Brown. Barbara was going to pick up Ashley from Eldra's house after work that night around 11:00 p.m. Barbara called Ashley at 10:56 p.m., 12:05 a.m., and 1:02 a.m., but she never answered. Barbara also called Eldra and Sharrod, but they, too, did not answer.

¶3. The next morning, Barbara went to Eldra's home looking for Ashley. When she arrived, the front gate was open, and the house was unlocked and had been ransacked, which was unusual for Eldra's home. After entering through the front door, she discovered Sharrod's and Ashley's bodies in a bedroom. Barbara immediately called 911 and reported

---

[1] *Weathersby v. State*, 165 Miss. 207, 209, 147 So. 481, 482 (1933).

2

what she had found.

¶4.    Officers arrived and found Ashley, Sharrod, and Eldra deceased inside the house. Sharrod's body was on the floor, protruding halfway into the hallway from a bedroom, and Ashley's body was on the bed with her pink laptop. The officers found Eldra's body in an adjacent room with gym equipment.

¶5.    Investigators quickly noticed that the home had metal bars on the windows preventing entry, and they all appeared undisturbed. The house had two doors. The front door was the only working entrance because the side door would not open. The house's foundation had been raised several years ago, which created a bulge that blocked the side door from opening inward. Furthermore, the side door's outer storm door could not be opened outward because it had been nailed shut for years. The State introduced a picture of the aluminum storm door sealed shut with a rusted nail. Lead Investigator Robert Bufkin concluded that there was no forced entry.

¶6.    Investigators also quickly noticed that a motion-activated surveillance camera was posted outside the front door of the house. The investigators secured the camera and obtained video footage from it. The video footage showed Beasley as the last person to enter the home on the night of the crime. Beasley entered the house at approximately 10:24 p.m. and left at approximately 10:48 p.m. The video footage clearly showed someone from inside the house opened the front door to allow Beasley to enter. Beasley was arrested the following day and gave a statement to police denying the killings. A Hinds County grand jury originally indicted Beasley for three counts of capital murder for the deaths of the three

3

victims. In his first trial, he was convicted by the jury of one count of capital murder and two counts of second-degree murder. *Beasley v. State*, 282 So. 3d 745, 747 (¶1) (Miss. Ct. App. 2019). After this Court reversed his convictions and remanded for a new trial, the State sought convictions for one count of capital murder and two counts of second-degree murder as was determined by the jury in his first trial.[2]

¶7. The second trial commenced on May 10, 2021, and ended on May 17, 2021. The State's first witness was Robert Bufkin. At the time of the crime, Bufkin worked with the crime-scene investigation unit for the Jackson Police Department and was the lead crime-scene investigator for these deaths. Investigator Bufkin testified that he responded to the crime scene and started his investigation. Inside the house, he found the three deceased victims. He determined that the only usable entrance was the front door. The side door was not usable and was nailed shut. The windows had metal bars. He testified there was no forced entry to the side door or windows.

¶8. Further, Investigator Bufkin testified he located a spent shell casing behind a door in a room with a pool table. There was no victim found in that room. Two of the three victims were found in another bedroom, and the third victim was found in a room where gym equipment was located. Despite there being three victims, investigators found only one shell casing. Investigator Bufkin testified he recovered a "spent projectile" that had traveled

---

[2] "[T]he State cannot put on proof that conflicts with or questions the findings of fact implicit in a prior acquittal because the Fifth Amendment's guaranty against double jeopardy protects [an individual] who has been acquitted from having to 'run the gauntlet' a second time." *Griffin v. State*, 545 So. 2d 729, 733 (Miss. 1989) (quoting *Ashe v. Swenson*, 397 U.S. 436 (1970)); *see also Sanders v. State*, 429 So. 2d 245, 246 (Miss. 1983).

4

through one of the victims, across the room, "re-entered the Sheetrock," "struck a wooden 2 x 4" and "fell down" in "the interior of the wall." Investigator Bufkin had to "cut the wall to get" the spent projectile out.

¶9. Investigator Bufkin testified that the front door had an installed and working motion-activated surveillance camera. He indicated that Detective Jerry Shoulders collected the camera and its footage. Investigator Bufkin also identified photographs showing a particular bedroom had been ransacked. He explained some of "the drawers were open" and "had been emptied out," the "bed mattress had been overturned," and the "cabinet" in the "lavatory" was "open also." Finally, Investigator Bufkin testified he did not recover any money from the crime scene but did find some marijuana. During cross-examination, Investigator Bufkin admitted he collected numerous items from the scene to be tested for DNA, but they were never tested.

¶10. The State introduced a photograph (through Bufkin) that depicted an open door to a chest freezer in the kitchen. The photograph indicated ice was still in the freezer, meaning it was in working order.

¶11. The State then called Barbara Taylor to testify. She was "best friends" with her sister, Ashley, one of the victims in this case. Barbara had driven Ashley to Eldra's home earlier to visit her boyfriend, Sharrod Brown.[3] Barbara explained she dropped Ashley off around noon and was set to pick her up after work later that day. When Barbara got off work, she called Ashley to see if she was ready to be picked up, but Ashley never answered. As a

---

[3] The transcript spelled "Sharrod" as "Sherod." We use the spelling as shown by the indictment.

result, Barbara started driving to the house. "[She] was calling [her] sister the entire time [she was] in route," but Ashley "wasn't responding." Barbara then stopped at her friend's house, and since her sister had not answered her multiple calls, she decided to go home for the evening.

¶12. Barbara testified that the next morning, "something just wasn't feeling right," and after learning that Ashley did not make it to work, Barbara "rushed to the house" to check on her sister. There she first noticed that the gate that was usually closed had been left open. Once she let herself in the house, she saw "a lot of trash, like a lot of [her] sister's belongings from her purse . . . on the floor." She also noted that the mattresses were overturned. She testified that she had never seen the mattresses turned over or trash all over the floor when she had previously visited the home. She proceeded through the house and "found Sharrod laid across the door and [her] sister in the bed." Once she saw the two victims, she ran out of the house to call the police. During Barbara's testimony, she noted that she knew Eldra's security camera was motion-activated and that during previous visits to the house, she had watched recordings on Eldra's laptop.

¶13. The State called Bret Gibson Jr. to testify. Bret was Eldra's uncle. He had grown up in Eldra's home where the three victims were shot, so he was familiar with the home. During his testimony, he confirmed Investigator Bufkin's testimony that there was only "one way in and one way out" of Eldra's house. The side door could not be opened because when Eldra and Bret had raised the house's foundation, they "over jacked it" and "left a hump by [the] back door." The "screen door" had "a big nail nailed through the wood" so "you

6

couldn't push the door open." The nail had been there "for years." Thus, the front door was the only workable entrance. Bret explained that the front door had a motion-activated security camera that "worked well" and "was always on[,] working." He noted that he had watched the video recorded from the camera on Eldra's "tablet" and sometimes on his TV.

¶14. The State called Detective Steven McNeal of the Jackson Police Department to testify. During his testimony, he confirmed that the victim's home had a motion-activated security camera that surveilled the home's front door. Before trial, Detective McNeal viewed the security camera footage. Detective McNeal testified that the time stamp on the video was off by approximately two hours, but he was able to determine the correct time because he knew what time the police had arrived on the day the three victims were discovered. He testified that the suspect, Beasley, went into the home on Moon Street at approximately 10:24 p.m. and left at approximately 10:48 p.m. It is clear that when Beasley walked up to the front door, someone opened it to let him in the house.[4] The security camera footage also showed, later in the night, an unknown male getting out of a truck and knocking on Eldra's front door, but he left when no one answered. The unknown male never entered the home. After he left, no human-related activity was on the security camera's video footage until Barbara arrived the following morning. Detective McNeal testified about a laptop monitor that was discovered sitting on a pool table. The laptop monitor was missing its bottom half. He also testified that during the investigation, they "did not find any money in the house."

¶15. After Detective McNeal discovered Beasley on the security camera, he executed a

_____

[4] In the video, the arm of someone inside the home opening the door for Beasley is clearly visible.

7

search warrant on his residence. During the search, officers found 9mm bullets hidden inside Beasley's air conditioning unit. Finally, McNeal testified that Beasley admitted he was the person seen on the video entering the home at 10:24 p.m. and leaving at 10:48 p.m. but he denied killing the victims.

¶16. The State also called Sergeant Steven McDonald, who worked at the Jackson Police Department at the time of the murders. He used a Cellebrite device to extract data from Ashley's phone.[5] He determined that Ashley's last answered incoming call was at 7:32 p.m., and her last outgoing call was at 8:17 p.m. His testimony suggested Ashley was likely killed sometime after 8:17 p.m. "Starting at 12:50 p.m.," Ashley's phone showed thirteen missed calls from Barbara.

¶17. The State also called Dr. Erin Barnhart to testify. She was stipulated to, tendered, and accepted as an expert in the field of forensic pathology. She had performed an autopsy on the victims and determined that each victim died from a gunshot wound to the head. A gunshot wound to Ashley's "cranial cavity" resulted in immediate death. Ashley did not have an exit wound; "the projectile was recovered from her . . . spinal area of the neck." Sharrod's wound was slightly different from Ashley's wound because of soot and stippling surrounding the entrance wound on his forehead. "The soot and stippling present on the skin is indicative of a closer range of fire" at a "range maximally of about 18 inches." A projectile was recovered from Sharrod's head. Eldra's wound also had stippling around the

---

[5] Sergeant McDonald explained that "[a] Cellebrite machine is a machine that's used to extract data from a cellular device and to put it onto a program, that is designed by Cellebrite, to physically analyze in order to be able to read that data."

entrance wound, but the projectile "passed through his brain and exited the back." Dr. Barnhart testified that "there was no projectile recovered" from Eldra's head. Finally, Dr. Barnhart testified that each victim's death was classified as a homicide.

¶18. The State called Detective Jerry Shoulders to testify next. He, like Detective McNeal, testified that Eldra's home had a motion-activated security camera that surveilled the home's front door. He recovered the footage from the video camera's SD memory card, burned a "forensically sound" copy, and reviewed all the surveillance videos. Detective Shoulders testified that the surveillance video from the night of the murders showed Beasley being let into the house with only a cell phone in his hand. Once Beasley let himself out, he had a "bulge" under the left side of his coat with "some kind of strap" dangling and a plastic bag in his right hand. In his testimony, Detective Shoulder stressed Beasley came into the home with only a cell phone in his hand but left with a plastic bag in his hand and a bulge under his coat. On his way out, Beasley left the outside front gate open. Detective Shoulders testified from the videos he watched that "the gate was always kept closed," and if the gate was open, "someone would come from inside of the home and close the gate." However, on the night of the murders, the gate was left open all night.

¶19. Detective Shoulders testified that "[o]n the pool table" inside the victim's home, "there was a part of a laptop, just the monitor." The other part of the laptop, "the lower part" that contains "the keyboard, the internal parts of the computer, . . ." was not attached. The "bottom part" appeared to have been "broken away" from the monitor. Finally, Detective Shoulder testified it appeared from the video that when Beasley left the residence, he had his

9

"hood covering his head," and there "appeared to be some type of moisture, possibly sweat on his forehead."

¶20. The State called Felicia McIntyre of the Mississippi Crime Laboratory to testify. She was tendered and accepted as an expert in the field of firearms and tool-mark examinations. She testified concerning her examinations of several pieces of evidence provided to her by detectives. She determined that the projectile found in the wall at the crime scene and the projectiles recovered during Ashley's and Sharrod's autopsies had all been fired from the same gun.

¶21. The State's final witness was Andrew Mozingo.[6] He was tendered and accepted by the parties as an expert in forensic technology. After Detective Shoulder's initial recovery of the camera, it was provided to Mozingo for analysis. Mozingo examined the video footage that was recorded by the camera and stored on an SD card. He, like Detective Shoulders, confirmed that "a person" arrived at the house around 10:49 p.m. and departed around 11:40 p.m.[7] Mozingo also confirmed a truck arrived at the house at 12:31 a.m., but no other person entered during this time period. *See Beasley*, 282 So. 3d at 747 (¶1).[8]

---

[6] The transcript spelled "Mozingo" as "Mazingo." We use the spelling as shown by his trial subpoena.

[7] It is important to note that while different witnesses describe different times, they were all referring to the same video depicting Beasley entering and exiting the home. Detective McNeal testified that the time stamp on the video was incorrect, but he was able to determine the correct time by comparing the video to the time of the police arriving on scene.

[8] Mozingo also confirmed that a person (Barbara) arrived at the house the next morning at 10:48 a.m. There was no other "human activity" between the time of the arrival of the unknown male (who did not enter the home the night before at 12:30 a.m.) and when

10

¶22.    Mozingo said he used accepted methods of collecting digital evidence, using a "write blocker," so original data would not be changed or corrupted. Without a "write blocker," plugging the SD card into a device could "write files to that USB drive." He admitted this particular SD card had a couple of "files where someone plugged it in and turned the computer on. . . ." Nevertheless, he believed the files were "consistent," and the SD card had not been modified, tampered with, or changed in any way. His expert opinion was made in reliance on the original SD card.

¶23.    After Mozingo's testimony, the State rested. The defense then moved for a directed verdict, claiming the State did not meet its burden of proving that Beasley committed an act that led to the death of the three victims. The court found that although there was no direct or eyewitness testimony, there was still sufficient circumstantial evidence to continue to present the case to the jury for a factual determination on the charges presented. The motion for a directed verdict was denied.

¶24.    The defense called Dr. David Dampier to rebut Detective Shoulders's and Mozingo's testimony. He was tendered and accepted as an expert in computer forensic technology. Dr. Dampier testified that there were "most likely" videos missing from the SD card. Among the missing files was the arrival of Ashley and Sharrod at the home earlier that day. He further testified that the SD card evidence was "grossly mishandled by the law enforcement officer

Barbara found the bodies the next morning at 10:50 a.m. The State asked Mozingo if anyone entered the residence at 12:31 a.m., but he was not allowed to answer the question because the defense objected. However, Detective Shoulders had previously testified that an unknown male did walk up to the front door at 12:30 a.m., which was after Beasley left the home, but that unknown male did not enter the home.

that handled the case." He stressed that the evidence could not be trusted because one can not "guarantee" that there was no "malicious action taken to corrupt it."

¶25. Beasley took the stand to testify. During his testimony, Beasley admitted to being at Eldra's house on the day of the murders and identified himself arriving and leaving the home in the security footage. Beasley admitted to being in the home for about forty minutes to an hour. Beasley admitted that he called Eldra before he entered the home and that Eldra "came to the door and let" him into the house. He indicated that once they were inside the home, they sat down in the living room, which is the "first room you get to." Beasley testified he sat on the couch and was "just talking and chilling and smoking." Beasley indicated Eldra "showed me some equipment" in the gym room, and then they walked back into the "front room."[9]

¶26. Beasley testified that he went to Eldra's house to "buy some marijuana," "chill out, sit down for a minute," and "you know, smoke." He testified that he was "on drugs at the time, like, marijuana, Xanax, and alcohol." Beasley admitted that he bought $500.00 of marijuana and $150.00 of "premium weed" that night for a total of $650.00. He paid Eldra in cash.[10] He indicated he did not take that money when he left the home, but he did take the marijuana he purchased with him and placed it under his jacket. He also admitted he had a plastic bag in his hand when he left the house, but the bag had a pair of "pants" in it that he

_____

[9] Eldra was found shot to death in the room with the gym equipment, and Beasley admitted to being in that room with the victim, albeit for reasons other than murder.

[10] Numerous witnesses testified there was no cash found at Eldra's home. Incidentally, no one testified that marijuana was located during the search of Beasley's home.

12

had borrowed from Eldra. He explained he borrowed the pair of pants to "hide the fact [he] had some weed." Beasley also admitted that he knew Eldra had "a camera" and that Eldra could view the front door's security camera footage on his laptop. Beasley denied that he took or destroyed the laptop from the house, stating that he would "have just took the whole TV and everything in there, if I was gone [sic] just take a laptop." Lastly, Beasley denied killing and robbing any of the victims. He stated, "I don't know anything about it."

¶27. After Beasley's testimony, the defense rested. The State called Andrew Mozingo in rebuttal to emphasize that Mozingo was "certain that [he] analyzed the original SD card, and [he] created an image of it." He explained, "[T]here were over 4,900 video files, [and] none of them were manipulated or changed." Finally, he testified, "[T]here were no video files that were deleted or taken off the SD card."

¶28. The jury found Beasley guilty of capital murder of Eldra Gibson and the second-degree murders of Ashley Taylor and Sharrod Brown. Beasley was sentenced to life imprisonment without eligibility for parole for the capital murder and two terms of thirty years in custody to run concurrently for the two convictions of second-degree murder. No post-trial motions were filed.

¶29. On appeal, Beasley raises three issues. First, Beasley asserts the evidence was insufficient to support the convictions. Second, Beasley claims the verdicts were against the overwhelming weight of the evidence. Lastly, Beasley claims he was entitled to an acquittal under the *Weathersby* rule or, in the alternative, that his trial counsel was constitutionally ineffective for failing to request a *Weathersby* instruction.

13

# ANALYSIS

## I. Whether sufficient evidence supports Beasley's conviction of capital murder and second-degree murder.

¶30. Beasley contends there was insufficient evidence to support the three convictions. In his brief, Beasley argues the State's case is based solely on circumstantial evidence because there was "no testimony, no direct evidence produced by the State, of what occurred . . . that night, at the time" Beasley was "admittedly present." In essence, Beasley argues there was no direct evidence of guilt. Specifically, he claims that some of the recordings from the surveillance video were lost. He continues that there was no DNA or fingerprints collected from the crime scene, and the Mississippi Crime Laboratory failed to conduct a comparison of ammunition.

¶31. Rulings on the sufficiency of the evidence claims are reviewed de novo. *Turner v. State*, 291 So. 3d 376, 383 (¶20) (Miss. Ct. App. 2020). When a challenge to the sufficiency of the evidence is raised on appeal, the relevant question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *McLaughlin v. State*, 338 So. 3d 705, 717 (¶33) (Miss. Ct. App. 2022) (internal quotation mark omitted). The evidence is viewed in a light most favorable to the State, and the State is given all favorable inferences that can be reasonably drawn from the evidence. *Williams v. State*, 285 So. 3d 156, 159 (¶11) (Miss. 2019). If the court finds that "any rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand." *Smith v. State*, 250 So. 3d 421, 424 (¶12) (Miss. 2018) (quoting *Cowart v.*

*State*, 178 So. 3d 651, 666 (¶41) (Miss. 2015)). "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements; rather, we must decide whether a reasonable juror could rationally say that the State did." *Johnson v. State*, 310 So. 3d 328, 331 (¶13) (Miss. Ct. App. 2021).

¶32. In this case, the required elements to prove capital murder beyond a reasonable doubt are (1) an unlawful killing (2) while engaged in the commission of a crime specifically listed in Mississippi Code Annotated section 97-3-19(2)(e) (Supp. 2013). In this case, Beasley was charged by the grand jury to have been in the commission of a robbery. The elements of robbery are that Beasley "(1) feloniously took (2) the personal property of another (3) in his presence or from his person and (4) against his will, (5) by violence to his person or by putting such person in fear of some immediate injury to his person." *Fulgham v. State*, 46 So. 3d 315, 323-24 (¶22) (Miss. 2010).

¶33. The Mississippi Supreme Court has long recognized that Mississippi follows the "one-continuous-transaction" rule for determining whether the evidence establishes the requisite nexus between the killing and the underlying felony to constitute capital murder. *Gillett v. State*, 56 So. 3d 469, 492 (¶50) (Miss. 2010). The supreme court explained:

> Where the two crimes e.g., murder and robbery[,] are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained. Regarding the underlying felony of robbery, **if the intervening time between the time of the murder and the time of taking of the property formed a continuous chain of events, the fact that the victim was dead when he took the property cannot absolve the defendant from the crime of robbery**. The State need not prove the defendant had the intent to rob prior to the killing. **Rather, the State has the burden to prove that the two crimes are connected in a chain of events and occur as part of the res gestae**.

*Batiste v. State,* 121 So. 3d 808, 831-32 (¶33) (Miss. 2013) (emphasis added) (citations and internal quotation marks omitted); *Jones v. State,* 354 So. 3d 384, 393 (¶30) (Miss. Ct. App. 2023).

¶34. Further, "the phrase 'while engaged in the commission of' includes the attempt to commit the crime, the completed crime, as well as the immediate post-crime acts of the defendant so connected to the homicide as to become a part of it." *Batiste,* 121 So. 3d at 833 (¶35).

¶35. To prove second-degree murder beyond a reasonable doubt, there must be a killing "done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual." Miss. Code Ann. § 97-3-19(1)(b). For second-degree murder, also known as depraved-heart murder, the defendant's conduct must be "so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life." *Montana v. State,* 822 So. 2d 954, 967 (¶55) (Miss. 2002). "[I]n cases involving shootings, the courts have consistently upheld convictions of depraved heart murder where the evidence suggested that the firing of a weapon was intentional, not accidental." *Steele v. State,* 852 So. 2d 78, 81 (¶12) (Miss. Ct. App. 2003).

¶36. Direct evidence "includes a confession, the testimony of an eyewitness . . . or surveillance video of the gravamen of the offense." *Morris v. State,* 303 So. 3d 9, 18 (¶28) (Miss. Ct. App. 2020); *see also Barber v. State,* 232 So. 3d 799, 802 (¶9) (Miss. Ct. App.

16

2017) (citing *Price v. State*, 749 So. 2d 1188, 1194 (¶16) (Miss. Ct. App. 1999)).[11]

Circumstantial evidence is "evidence which, without going directly to prove the existence of fact, gives rise to a logical inference that such a fact does exist." *Keys v. State*, 478 So. 2d 266, 268 (Miss. 1985). "A circumstantial-evidence case is one where the State is 'without a confession and wholly without eyewitnesses to the gravamen of the offense charged.'" *Chism v. State*, 253 So. 3d 343, 349 (¶29) (Miss. Ct. App. 2018) (quoting *Garrett v. State*, 921 So. 2d 288, 291 (¶17) (Miss. 2006)).

¶37.    Mississippi caselaw has a "clear and longstanding position that circumstantial evidence and direct evidence carry the same weight." *Nevels v. State*, 325 So. 3d 627, 632 (¶14) (Miss. 2021); *accord Williams v. State*, 305 So. 3d 1122, 1129 (¶17) (Miss. 2020) ("Evidence is either direct or circumstantial. And both types of evidence carry the same weight."); *Cardwell v. State*, 461 So. 2d 754, 760 (Miss. 1984) ("Circumstantial evidence is entitled to the same weight and effect as direct evidence[,] and this Court has upheld convictions based solely on circumstantial evidence."); *Bogard v. State*, 233 So. 2d 102, 105 (Miss. 1970) ("[I]t is pointed out that circumstantial evidence, ordinarily, is entitled to the same effect and weight as direct evidence and may, in the concrete, be the more reliable and stronger." (internal quotation marks omitted)).

¶38.    Moreover, the Mississippi Supreme Court has repeatedly held, "Direct evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to

___

[11] *Nevels v. State*, 325 So. 3d 627, 634 (¶20) (Miss. 2021), obviated the requirement of providing an additional circumstantial evidence jury instruction in a purely circumstantial evidence case.

17

establish guilt beyond a reasonable doubt." *Campbell v. State*, 798 So. 2d 524, 528 (¶12) (Miss. 2001) (quoting *Underwood v. State*, 708 So.2d 18, 35 (¶49) (Miss. 1998)); *see also Gray v. State*, 328 So. 3d 194, 198 (¶12) (Miss. Ct. App. 2021), *cert. denied*, 328 So. 3d 1251 (Miss. 2021). "[A]lthough [a] defendant's statement that he had been at the scene of the crime within hours of the crime was not an admission to the crime, it did constitute . . . an admission by the defendant on a significant element of the offense." *Kennedy v. State*, 309 So. 3d 30, 38 (¶25) (Miss. Ct. App. 2020) (internal quotation marks omitted).

¶39.    The surveillance videos show Beasley present at the murder scene. He was the only person who walked inside when the victims were alive.[12] There was no dispute at trial that it was indeed Beasley on the video; as he admitted that he was at the house and was the male on the video. The video proved Beasley was in the house at 10:48 p.m. Beasley was seen being let in the house with only his cell phone by someone from inside. Beasley was seen leaving the house on the video at 11:41 p.m. He let himself out of the house with his hoodie over his head and was carrying items he did not arrive with, including a plastic bag in his right hand and a bulge under his jacket with some kind of strap hanging out of it. On his way out, Beasley left the outside front gate open, which was abnormal considering Detective Shoulders's testimony that "the gate was always kept closed," and if the gate was open,

---

[12] Beasley was the only person to enter or exit the house at the time the victims were murdered. Sergeant McDonald testified that Ashley's phone provided a time frame for the murders. The last incoming call that Ashley answered was at 7:32 p.m., and the last outgoing call she made was at 8:17 p.m. By midnight, she had multiple missed calls, mostly from her sister. This evidence suggests that the victims were murdered between 8:17 p.m. and midnight. The security video confirms Beasley was the only person who entered and left during this time frame.

"someone would come from inside of the home and close the gate."

¶40.   The front door with the video camera was the only way to enter the home.  The side door would not open inward because of a bulge in the floor, which was caused when the house had been "jacked up" many years before.  Further, the storm door to the side door was nailed shut and had been for years.  The windows were protected with metal bars preventing entry.  Lead Investigator Bufkin testified that there was no forced entry into any part of the home.  Therefore, the evidence, when viewed in favor of the State, shows that the person who killed the victims likely entered through the front door.  It follows that the perpetrator would have been captured on the surveillance video at the front door.  Beasley was the last person seen entering and exiting the front door on the surveillance video.[13]  After Beasley left, no other person entered the home until the bodies were discovered the next morning.

¶41.   Dr. Barnhart, a forensic pathologist, testified that the manner of death for all three victims was homicide, and the cause of each death was a single gunshot wound to the head.  Dr. Barnhart's determination, coupled with the fact that Beasley was the only person to enter or leave the house at the time of the murders, suggests at least two possible scenarios.  The first scenario is that one person inside the house shot two victims and then committed suicide.  However, only one of the three shell casings was found, and no weapon was found at the crime scene.  The second scenario is that Beasley entered the house when the victims were alive and shot and killed all three victims.  A reasonable juror could find the second scenario was proved since no gun was found, and only one out of the three shell casings were

---

[13] Beasley testified that all three victims were alive when he left the home.  According to Beasley, he conducted a marijuana transaction with Eldra.

found at the crime scene. It would be reasonable for a jury to assume the offender took the two shell casings to hide the evidence. The other shell casing that was found was behind a door, which could indicate that it was not found by the suspect because he was in a rush to flee the home.

¶42. Lastly, all three victims were murdered with the same type of ammunition found at Beasley's house. Felicia McIntyre, the firearms chief at the Mississippi Crime Laboratory, determined that the projectiles recovered from a wall at the crime scene and from the skulls of Ashley and Sharrod during their autopsies were from the same 9mm handgun. Incidentally, the police discovered a box of 9mm live rounds was hidden inside the air conditioning unit in Beasley's house.

¶43. Usually, Edlra's home was "[w]ell put together," but on the day of the murders, it had been "ransacked." Further, Barbara said she noticed the belongings from Ashley's purse had been scattered over the living room floor, dresser drawers had been opened and emptied, mattresses were overturned, and a bathroom cabinet was open. There was sufficient evidence for reasonable jurors to find that the mess was the result of someone searching for items to take from the victims.

¶44. Further, at the crime scene, someone had broken Eldra's laptop in half, leaving only the monitor. Beasley testified that he knew Eldra used his laptop to view the front door's security camera footage and admitted that he was unaware that the footage was saved on an SD card inside the camera rather than the laptop. Beasley admitted leaving a house with a "bulge" under his jacket, though he claimed it was marijuana he had purchased. A

reasonable juror could have found that Beasley broke the laptop to destroy the video evidence of him at the crime scene. This finding would explain why the offender left Ashley's pink laptop unscathed. Beasley further testified that he paid Eldra $650.00 on the night of the killings for the marijuana he had purchased from Eldra, but no money was found at Eldra's house during the investigation. A reasonable jury could have found that this inconsistency was not only additional circumstantial evidence of guilt but also concerned Beasley's credibility.

¶45. Mississippi's caselaw is clear: when the evidence conflicts, the jury determines the facts in dispute. The jury is the "sole judge of the credibility of witnesses and the weight and worth of their testimony." *See Solanki v. Ervin*, 21 So. 3d 552, 568 (¶41) (Miss. 2009) (citing *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980)). As an appellate court, "we do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). Regarding the weight of the evidence discussed below, "[o]ur role as [an] appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.*

¶46. Regarding the sufficiency of the evidence, and viewing the evidence in the light most favorable to the State, a rational juror could have reasonably found that the State proved Beasley unlawfully killed the victims while engaged in the commission of a robbery. The surveillance videos showed Beasley entering the front door before the killings, and he was

allowed entry when one of the victims opened the front door for him. Further, Beasley admitted to entering the house while the victims were alive and leaving with marijuana and the pants, but he denied killing anyone. No other person was seen entering the home after Beasley left and before the victims were discovered. The firearm and two of the three shell casings were not at the scene. The gate to the front fence, which was always closed, was open. Testimony revealed that if the gate was left open, someone always exited the house and shut the gate. Numerous witnesses testified Eldra watched the front door's camera feed. The video shows that when Beasley left the house, he left that front gate open. It was never shut. The video supports Barbara's testimony that the gate was open when she arrived the next morning. The victims were killed with the same general type of ammunition later found at Beasley's house. Therefore, there is sufficient evidence for a rational juror to conclude that Beasley was the person who entered the house while the victims were alive, murdered the victims, and left after they died.

¶47.     As to the elements of robbery, the security video shows Beasley arriving at Eldra's house with only a cell phone and leaving with a "bulge" underneath his coat, "some type of strap," and a plastic bag. Further, the house had been "ransacked," and the contents of Ashley's purse obviously had been emptied on the floor of the living room. A rational juror could determine beyond a reasonable doubt that Beasley took items he did not arrive with by committing a robbery.

¶48.     Viewing the evidence in the light most favorable to the State, we find that the evidence was sufficient to prove each statutory element for capital murder with robbery as

22

the underlying felony and second-degree murder.

## II. Whether the verdicts were contrary to the weight of the evidence.

¶49. "A challenge to the weight of the evidence is separate and distinct from a challenge to the legal sufficiency of the evidence." *Thomas v. State*, 48 So. 3d 460, 469 (¶20) (Miss. 2010) (citing *Fleming v. State*, 732 So. 2d 172, 183 (¶36) (Miss. 1999)). The Court's review is limited: the evidence is viewed in the light most favorable to the verdicts, and the standard we apply to the trial court's ruling on the request for a new trial is abuse of discretion. *Id.*; *see McClain v. State*, 625 So. 2d 774, 781 (Miss. 1993). This Court will not reverse the trial court's decision unless a verdict is "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction as an unconscionable injustice." *Fleming*, 732 So. 2d at 183 (¶38).

¶50. It is well established that the jury determines matters of weight, credibility, and conflicting evidence. *See McCool*, 328 So. 3d at 184-85 (¶47). Circumstantial evidence is entitled to the same weight and effect as direct evidence. *Sherrell v. State*, 622 So. 2d 1233, 1238 (Miss. 1993). As a result, this Court has upheld convictions based on circumstantial evidence alone. *Id.* An appellate court does not "assume the role of juror on appeal." *Thompson v. State*, 338 So. 3d 730, 736 (¶28) (Miss. Ct. App. 2022).

¶51. Beasley contends that there is no testimony or direct evidence that he committed the crimes charged against him. Yet the only evidence Beasley submitted supporting his claim is that the Jackson Police Department lost 200 SD card files from the video footage. In an effort to support his case, Beasley used Dr. Dampier's testimony to persuade the jury to

23

believe it was possible there were "other person[s] entering and leaving the house" during the time of the murders. The State rebutted Beasley's efforts with Mozingo's testimony that the SD cards had not been "altered, changed, added to[,] or deleted." The Supreme Court has explained that "[e]videntiary conflicts and credibility issues are questions for the jury, not grounds for a new trial." *Flowers v. State*, 156 So. 3d 805, 805-06 (¶1) (Miss. 2013).

¶52.    We hold that affirming the jury's verdicts does not sanction an unconscionable injustice. Without repeating the evidence previously discussed, when viewed in the light most favorable to the verdicts, there was ample evidence for which the jury could determine guilt beyond a reasonable doubt. The trial court did not abuse its discretion.

III.    **Whether this Court should review the *Weathersby* claim, and whether Beasley's trial counsel was ineffective for failing to ask for a *Weathersby* instruction.**

¶53.    Beasley argues that he is entitled to an acquittal under the *Weathersby* rule. The *Weathersby* rule states, "Where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge." *Weathersby v. State*, 165 Miss. 207, 209, 147 So. 481, 482 (1933). When the record fails to prove that anyone saw the trauma that caused the victim's death, the *Weathersby* rule is inapplicable. *See Kidd v. State,* 258 So. 2d 423, 429 (Miss. 1972).

¶54.    Beasley testified that he did not witness the murders. Therefore, he is not an eyewitness to the murders. Thus, the *Weathersby* rule is inapplicable, and this argument

24

lacks merit.

¶55. Moreover, Beasley failed to make the *Weathersby* argument as a ground for a directed verdict before the trial court, which procedurally bars the argument. *McGuire v. State*, 170 So. 3d 570, 577 (¶18) (Miss. Ct. App. 2014).

¶56. Lastly, Beasley argued that his trial counsel was constitutionally ineffective for failing to request a *Weathersby* instruction. Whether a criminal defendant has received ineffective assistance of counsel is a question of law reviewed de novo by a two-part analysis. *Taylor v. State*, 167 So. 3d 1143, 1146 (¶5) (Miss. 2015). To prevail on a claim of ineffective assistance of counsel, Beasley must show: (1) his counsel's performance was deficient, and (2) "the deficient performance prejudiced the defense." *Id.* Prejudice requires a showing that "but for counsel's errors, the results of the trial would have been different." *Boleyn v. State*, 101 So. 3d 1178, 1181 (¶19) (Miss. Ct. App. 2012).

¶57. As noted earlier, the *Weathersby* rule is inapplicable to Beasley and would not have entitled him to a directed verdict of acquittal. Since the *Weathersby* rule is inapplicable, trial counsel was not deficient for failing to raise it. This issue is without merit.

## CONCLUSION

¶58. In this case, sufficient evidence supports Beasley's convictions of capital murder and second-degree murder. Additionally, the verdicts were not against the overwhelming weight because there was ample evidence for the jury to have relied on in determining guilt, and the ruling does not sanction an unconscionable injustice. Lastly, the *Weathersby* rule is inapplicable to the facts of this case. Therefore Beasley's trial counsel did not act in a

deficient manner by failing to request such an instruction or including it as part of the motion for a directed verdict.

¶59. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, SMITH AND EMFINGER, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**